47 N.J. Super. 172 (1957)
135 A.2d 574
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
HAROLD JARDINE SAMURINE AND GERTRUDE SAMURINE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 21, 1957.
Decided October 28, 1957.
*174 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Albert G. Besser argued the cause for defendants-appellants.
Mr. Cuddie E. Davidson, Jr., argued the cause for plaintiff-respondent (Mr. H. Russell Morse, Jr., Prosecutor of Union County, and Mr. Calvin J. Hurd, Assistant Prosecutor, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal from a judgment of conviction entered against defendants in the Union County Court on an indictment charging them with obtaining money under false pretenses, N.J.S. 2A:111-1.
Early in 1956 defendants, under the name of Royal Shackamaxon Country Club, Inc., purchased from the trustee in bankruptcy of the Shackamaxon Country Club, Inc., all of the real and personal property assets of the bankrupt, including the goods and chattels listed in the official appraisal, consisting of some 464 separate items. It appears that defendants immediately entered into possession of the premises and set about preparing the club for operations during *175 the 1956 season. Shortly thereafter defendant Harold Samurine, the president and, for all practical purposes, sole owner and manager of Shackamaxon, was twice compelled to utilize the services of Modern Funding Corporation, a money broker, to obtain operating capital. There were three real estate mortgages on the country club property, and Modern Funding specifically knew, as a result of an earlier loan made in February, that the personalty acquired by the corporation at the bankruptcy sale was encumbered by a chattel mortgage given in July 1954. In fact, its employee, Bukarest, a New Jersey attorney who described himself as a negotiator of loans and administrator, had seen a copy of that mortgage.
By the end of February 1956 the country club venture was in a critical financial condition. A $22,000 monthly installment on a third mortgage was due and the mortgagee was pressing for payment. Samurine phoned Modern Funding on March 2, 1956 and requested that it arrange for another loan. It got in touch with the complaining witness Metrick, a New York lawyer who, as a sideline, had engaged in financial ventures of one kind or another during the past several years. On the afternoon of that day, a Friday, Bukarest and Kroland, a "trouble shooter" for Modern Funding and manager of its New Jersey office, drove Metrick from New York City to the country club in Summit, N.J. to meet Samurine and to inspect the premises. Metrick testified that when Rothman, president of Modern Funding, had spoken to him that morning he had assured him there were only three real estate mortgages on the club property, but no chattel mortgage.
Upon arrival at the country club Metrick was introduced to Samurine who took him on a 10-15 minute inspection tour of the premises and of the personal property which was to be given as partial security for the proposed loan. He says that Samurine assured him the chattels were free and clear; however, Bukarest and Kroland were not present at the time. (This was in contradiction to what Metrick had testified to in the course of another proceeding in the Chancery Division, but accorded with testimony by Bukarest and Kroland that they had not heard Samurine make any such *176 representation.) Following the inspection, Metrick authorized Modern Funding to proceed with arrangements to consummate the loan, including the preparation and execution of whatever instruments were necessary to secure it. He left his personal check of $23,000 with Kroland, payable to the order of Modern Funding. The loan on its face was for $24,000  $1,000 was a bonus to Metrick, $1,000 was to cover the expenses, commissions and bonus of Modern Funding, and $22,000 eventually went to the country club.
The appropriate papers were promptly drawn up by Modern Funding's attorney and delivered to Bukarest for execution by defendants. He presented himself at defendants' home during noon-hour, Monday, March 5, and proceeded to have the papers executed. The picture we get from Mrs. Samurine's testimony is that her husband was in a state of great anxiety because he had promised to have the payment on the third mortgage at the bank by that hour. He hastily looked at the papers, signed them, took Modern Funding's $22,000 check from Bukarest, and departed for the bank. Bukarest and Mrs. Samurine had something to eat and she signed the papers without reading them. Bukarest's account of what happened is as unsatisfactory as was the rest of his testimony, which was vague and shot through with evasiveness, claimed loss of memory and, indeed, with outright false answers  proved false when he was time and again confronted with contradictory testimony given in the Chancery Division action.
Among the papers signed at the Samurine home on March 5 were the $24,000 note, the chattel mortgage, a loan agreement, and an assignment of Samurine's interest in a number of valuable lots as further collateral security. The chattel mortgage included the following typewritten clause:
"And the parties of the first part do hereby specifically affirm and represent that the said chattels herein are not affected by any liens of record or by any liens created by them since their acquisition of all of the issued and outstanding capital stock of the Royal Shackamaxon Country Club, Inc."
*177 However, the instrument did not include a list of the mortgaged personalty, but simply incorporated by reference all of the chattels set out in the bankruptcy appraisal.
The loan agreement recited the execution and delivery of the chattel mortgage as additional security for the $24,000 loan, covering the chattels set out in the bankruptcy appraisal, which chattels, the agreement went on to say,
"* * * [defendants] specifically claim to be presently unencumbered and not affected by any of the liens appearing of record or created by them since their acquisition of all of the issued and outstanding capital stock of the said Country Club, all of which information is peculiarly within the personal knowledge of the borrowers herein, and substantiation of which the said borrowers represent can be determined by examination of their records of the transaction with the Referee in Bankruptcy, and which representation the Lender herein accepts as true without the opportunity of independent investigation thereof by reason of the urgency of consummation of the within loan * * *."
Neither Metrick nor any other person on his behalf or the broker's, Modern Funding, conducted any search of the public records to determine whether there were any existing liens on the chattels being mortgaged, despite the fact that the broker had learned some three weeks before that there was then a chattel mortgage of record.
The trial court had insisted that the State establish that the chattels covered by the March 5, 1956 mortgage were the same as those included in the bankruptcy schedule. The State was able to prove that only ten items of the 464 listed in the appraisal, having a value of only $1,490 as against the grand total of $33,312.55, were actually covered by the 1954 mortgage.
There was a motion for judgment of acquittal at the end of the State's case. It was denied. The jury returned a verdict of guilty as to each defendant. A motion for a new trial was denied. Thereafter the trial court sentenced Harold Samurine to serve six months in the county jail and pay a $300 fine; his wife was sentenced to a similar term, sentence being suspended.
*178 On this appeal defendants argue, among other points, that the trial court erred in refusing to compel the production of the minutes of the grand jury testimony by the State's chief witness, Metrick, so that it might be determined whether there was any contradiction in fact between his testimony at the trial and that given before the grand jury. See Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); United States v. Rosenberg, 245 F.2d 870 (3 Cir. 1957); United States v. Procter & Gamble Co., 19 F.R.D. 122 (D.C.N.J. 1956); State v. Silverman, 100 N.J.L. 249 (Sup. Ct. 1924); State v. Bovino, 89 N.J.L. 586 (E. & A. 1916); 8 Wigmore, Evidence (3d ed. 1940), § 2363, p. 726. The contention would be unanswerable were it not for the fact that the record clearly reveals that counsel for defendants was twice given the opportunity to apply to the assignment judge for leave to inspect the minutes, although the trial court was not sure there actually was a transcript of the complaining witness' testimony. Counsel failed to act on the invitation. Moreover, when Metrick was recalled for additional cross-examination, defendants' counsel did not go into the matter. The call for the production of the grand jury minutes may therefore be considered as having been abandoned at the trial. Indeed, defense counsel frankly abandoned the point at the oral argument.
Defendants contend there was prejudicial error in the trial court's denial of their motion for a mistrial because Metrick, in the course of his testimony, twice mentioned the past criminal record of Harold Samurine. On direct examination he was asked about a conversation he had with Samurine subsequent to the loan transaction:
"Q. First relate to us the substance of the conversation?
A. Yes. Then I went back to Mr. Samurine and we had an argument and I told him that I was very much disturbed because I had just found out that he had a criminal record."
Defendants' attorney at once moved for a mistrial. The trial judge denied the motion, saying, "Let's forget that. If that is true, that is only something to be brought out to affect his *179 credibility"; to which defense counsel replied that the witness was an attorney and "he above all should know better than to make remarks like that."
On the next day of the trial the following happened in the course of cross-examining the same witness:
"Q. Mr. Metrick, when did you first go to the Prosecutor's Office with respect to this case?
A. I believe it was after I was convinced that Mr. Samurine and Royal Shackamaxon Country Club did not intend to give me my money.
Q. Yes, exactly.
A. And after I had several conversations with Mr. Samurine, after I had found out about his criminal past, then I decided that I ought to go to see the County Prosecutor."
Mr. Besser: No, if your Honor please, this is the second time that this witness has made a reference to a so-called criminal past.
The Court: I want to caution the witness, and you should know this 
Mr. Besser: As a lawyer.
The Court:  that the Prosecutor may question the defendant on cross examination with reference to that point, if he has any evidence to affect his credibility only. Now, you are the State's witness and you are attempting to prove your particular case against this defendant by trying to show conviction in another matter. Now, the State cannot prove that this defendant is guilty of anything by showing his conviction in another matter.
The Witness: I only mentioned it, your Honor, when counsel asked me when I decided to go to the Prosecutor, when I went there.
The Court: You were cautioned about it yesterday."
These references to defendant's criminal record  whatever that record may have been  were gratuitous if not deliberate, coming as they did from the mouth of a lawyer. The trial court charged the jury to disregard the testimony:
"One of the State's witnesses Mr. Metrick testified that he heard that Mr. Samurine had a criminal record. This was objected to. The objection was sustained, and the evidence was ordered stricken. You are to disregard that testimony altogether. In the first place, it was only hearsay evidence and incompetent. And, secondly, it has nothing to do with the guilt or innocence of the defendants with reference to this particular charge. So, you are to ignore this testimony in your deliberation since it is no part of the evidence in the case. It was ordered stricken."
*180 It is impossible to assay the prejudicial effect of this testimony. Defendant was faced with a dilemma. Had he taken the stand, he would have waived whatever objection he might have had to these references to a criminal record, for on cross-examination that record could have been revealed to impeach his credibility. N.J.S. 2A:81-12. As was said by Judge Frank in United States v. Grunewald, 233 F.2d 556, 578, n. 15 (2 Cir. 1956), reversed 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), a defendant with a prior criminal record usually refrains from testifying in his own behalf because cross-examination may then reveal that record:
"* * * Virtually all experienced lawyers and judges acknowledge that, almost invariably, the jury will treat such evidence as evidence of the defendant's guilt of the crime for which he is on trial, despite the judge's instruction that they must consider it as bearing on the defendant's credibility only. On that count, usually the lawyer for an accused with a criminal record will advise him not to testify. Yet his failure to do so is likely to convince the jury of his guilt. Either way he is likely to be convicted."
Samurine did not take the stand. By choosing to remain silent he not only exposed himself to the presumption such silence creates in New Jersey  the trial judge, as was to be expected, charged the principles applicable where a defendant does not testify in his own defense  but also rendered himself vulnerable to the likelihood that the jury, especially because of Metrick's double reference, counsel's objections, the subsequent colloquy, and finally the court's remarks and charge to the jury, would assume he had a criminal record, and from that infer his guilt of the crime charged.
The State claims that whatever error may have been committed was subsequently eliminated by the court's charge to the jury. One cannot suspend common sense in assessing the prejudice that may have been visited upon defendant because of Metrick's gratuitous statements. The State, in fact, admits in its brief there was "strong likelihood" that the jury, hearing the testimony about defendant's criminal record, might be inclined to assume that guilt attached by reason thereof, but falls back upon the eradicating influence *181 of the charge. At the very opening of his oral argument, counsel for the State further admitted, with commendable candor, that the record was such that the jury could as well have reached a verdict of not guilty as guilty, on the facts of this case. As we shall shortly indicate, the testimony on the question of guilty knowledge was such that no guilty verdict should have been returned.
In the light of the record, the trial judge's direction that the jury disregard the references to defendant's alleged prior criminal record merely emphasized the prejudicial testimony. The futility of his action is pointedly illustrated by what was said in United States v. Grunewald, above, 233 F.2d at page 573  that "a cautionary instruction may emphasize the very matter the jury is told to forget `as in the story by Mark Twain, of the boy told to stand in the corner and not think of a white elephant.'" Mr. Justice Jackson, concurring in Krulewitch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949), observed: "The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction." And see Haid v. Loderstedt, 45 N.J. Super. 547 (App. Div. 1957), where Judge (now Justice) Francis, speaking for this court, reversed a verdict for a defendant in an automobile accident suit because, among other grounds, counsel improperly had suggested to the jury that the defendant was not protected by insurance. He took occasion to note the uselessness of instructing the jury to ignore such prejudicial comment, quoting from Georgeson v. Nielsen, 218 Wis. 180, 260 N.W. 461 (Sup. Ct. 1935).
In determining whether prejudicial testimony has been eradicated by prompt trial court action or, on the other hand, is so harmful that it cannot be eliminated except by declaring a mistrial, the burden is on the State to prove no possible injury to defendant. The criterion is not whether the evidence, shorn of the wrongful testimony, is sufficient to support a conviction, but rather whether the prejudicial remarks, viewed against the entire setting of the case, may *182 have possibly affected the jury's deliberations. All doubts must be resolved in favor of the defendant. The court in Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), stated that "* * * if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." Cf. State v. Leaks, 124 N.J.L. 261, 265 (E. & A. 1940); State v. McCarthy, 2 N.J. Misc. 59, 123 A. 296 (Sup. Ct. 1924); Bullock v. State, 65 N.J.L. 557, 575-576 (E. & A. 1900).
In our opinion, the State has failed to demonstrate that Metrick's testimony was so removed from the case by the court's charge that it may not possibly have affected the jury's deliberations. Where the proof of Samurine's guilt is as thin as the State itself recognizes it to be, we are inclined to the view that the references to his criminal record must have played a substantial part in the jury's considerations, and that despite the charge it was impossible for the jurors to subtract this testimony from the total of the evidence and discard it from their minds.
In short, the prejudicial effect of Metrick's testimony was so substantial as to warrant reversal on this ground alone as to Samurine. This reversal would also carry in favor of Mrs. Samurine, for she obviously was only a secondary figure in the whole transaction. She had nothing to do with Metrick or the placing of the loan, and was implicated only because she was Samurine's wife and had signed the papers. The State practically admitted as much at the oral argument when it said that what may have happened was that the jury, having found Samurine guilty, found her guilty, too.
*183 Reversal for the reason just indicated would call for a new trial. However, we are of the opinion that the conviction should be reversed and a judgment of acquittal directed to be entered in defendants' favor because of lack of proof.
The indictment charged that defendants, intending to cheat and defraud Metrick, did "knowingly and designedly falsely represent" to him that they were the owners of all the goods and chattels in the Royal Shackamaxon premises and that "said chattels were not affected by any liens of record whereas in truth and in fact as the said [defendants] then and there well knew, said chattels were affected by liens of record," Metrick being deceived thereby; and that defendants obtained $23,000 from him with intent to cheat and defraud him thereof.
N.J.S. 2A:111-1, under which the indictment was brought, provides that "Any person who, knowingly or designedly, with intent to cheat or defraud any other person, obtains any money, property, * * * or other thing of value by means of false promises, statements, representations, * * * is guilty of a misdemeanor." Defendants claim the State failed to prove (1) that there was any misrepresentation; (2) knowledge on the part of either defendant that the representation was false; and (3) Metrick's reliance upon that representation, assuming it was false. We deal only with the second point  scienter.
In an indictment for obtaining money by false pretenses, defendant must be shown to have known of the falsity of the representation. Falsity, in the sense of N.J.S. 2A:111-1, must be subjective as well as objective; the statement must not only be false in fact but false to the knowledge of its utterer. The burden of proving guilty knowledge is on the prosecution, and failure of the State to prove the existence of this element compels acquittal even though a misrepresentation may in fact have been made. Sharp v. State, 53 N.J.L. 511 (Sup. Ct. 1891).
There is nothing in the record to establish guilty knowledge or, for that matter, misrepresentation or an intention to defraud, by Mrs. Samurine. Her role in the entire *184 transaction was merely that of a wife who was ready to sign anything that would help her husband carry the country club venture through the dangerous financial shoals which threatened it. There is no evidence that she was familiar with the steps that led to the making of the loan or with the details of the several instruments Bukarest asked her to sign over luncheon on March 5, other than that she knew in a general way that these were papers in connection with getting money to pay the installment due on the third mortgage.
As for Samurine the State's proof, fairly appraised, comes to nothing more than this  that in the course of showing Metrick around the club premises Samurine told him the chattels were free and clear  and Metrick is the only one who testified as to such representation. There were also the representations in the chattel mortgage and loan agreement from which we have quoted. Whether Samurine, anxious to get to the bank and on tenterhooks because Bukarest was late in showing up, took the time to read them, depends upon whether Bukarest's testimony, which we have already characterized, was to be believed. Incidentally, Bukarest, who knew that a chattel mortgage had been given by the former country club corporation in 1954, did not caution the Samurines about its possible continued existence. There is the further fact that the chattel mortgage presented to defendants for their signatures did not contain a list of the chattels being mortgaged.
The indictment charges defendants with actual knowledge of the falseness of the representation that the chattels were free and clear of liens, and the court in its charge also instructed the jury that there had to be actual knowledge. The State failed to prove such knowledge, even circumstantially.
The State argues that defendants were chargeable with knowledge of a prior encumbrance because the 1954 chattel mortgage had been recorded, thereby imputing constructive knowledge thereof to them. We are dealing with a criminal case, and not a civil matter involving priority of interests in the light of a recorded lien. The indictment charged actual guilty knowledge, not constructive knowledge.
*185 Because of this failure of proof, there should be an acquittal for defendant Samurine as well as his wife.
We pause to comment upon the State's contention that "if it appeared that defendants made the representations and did not know in fact that the representations were true, such evidence is sufficient to justify a verdict of guilty by jury," citing 2 Wharton, Criminal Law (12th ed. 1932), § 1454, p. 1741. The exact quotation from Wharton is that "proof that the defendant was ignorant of a fact that he stated sustains a charge of false statement." The author cites a single case in support, Reese River Mining Co. v. Smith, L.R. 4 H.L. 79, 39 L.J. Ch. (N.S.) 849 (H.L. 1870), a civil case sounding in equitable fraud and certainly not apposite in the instant circumstances. We need not decide whether the rule as stated by Wharton would be a correct construction of our statute, N.J.S. 2A:111-1. Where, as here, the State undertakes to charge actual guilty knowledge, it must prove the charge. On the record before us, the jury verdict can be supported only on the basis of conjecture.
The judgment under review is reversed, with direction that a judgment of acquittal be entered in favor of both defendants.