52 N.J. Super. 378 (1958)
145 A.2d 631
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH O. BAECHLOR, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 22, 1958.
Decided October 31, 1958.
*381 Before Judges GOLDMANN, FREUND and HANEMAN.
*382 Mr. Frederick F. Richardson argued the cause for appellant.
Mr. William D. Danberry, Assistant Prosecutor, argued cutor)
The opinion of the court was delivered by HANEMAN, J.A.D.
Defendant was convicted of the crimes of breaking and entering and of stealing $4,682. He was sentenced to State Prison for consecutive terms of three and a half to five years on each conviction. He appeals from the conviction and sentences imposed.
On Friday, September 28, 1956, at about 8:30 P.M., the cause for respondent (Mr. Warren W. Wilentz, Prose-Milton Saltzman secured his business premises, the Raritan Lumber Company, for the night. The building, which is devoted to use in the business as an office and warehouse, faces upon Route 18 in East Brunswick. The rear property line of the premises is contiguous to the Old Bridge Turnpike. Saltzman returned on Saturday, September 29, and found that the safe used in the business for the safe-keeping of money, records, etc., had been moved from its usual location in the office of the building to the warehouse portion of the building. The safe had been forced open. The money, approximately $4,600, which had been placed in the safe the evening before, was missing. The business records were strewn about on the floor. Further investigation disclosed that an overhead door at the rear of the building had been forced open. The premises are protected along the rear property line by a cyclone-type fence, surmounted with three strands of barbed wire. One three-strand section of the barbed wire had been severed. Wooden planks were on the ground on both sides of the fence near the place where the wires had been cut. Saltzman called the police.
Three persons were arrested and separately indicted on two counts, i.e., breaking and entering with intent to steal, and stealing $4,682, each count relating to the premises and property of the Raritan Lumber Company. Two of these *383 persons, Donald Tremper and Herbert Flanagan, pleaded non vult to the charges and each was sentenced, prior to defendant's trial, to State Prison for a concurrent term of seven to ten years on each count of the indictment. They were called as witnesses for the State at Baechlor's trial.
Tremper testified as follows: He drove the automobile used for transportation to and from the scene. He and Baechlor had visited the premises a few days prior to the robbery for the purpose of "casing" the layout. They posed as customers during this preliminary inspection. While there, Tremper observed a small Mosler safe. After the inspection he discussed the prospects of success with Baechlor. The gist of this discussion was that the safe was a difficult one to break and that access to the premises presented problems. Two or three days later Tremper, Baechlor and Flanagan decided to break into the building. Tremper chauffered the other two to a place on the roadway near the rear fenced-in portion of the premises at about 8 P.M. The building was still occupied. They bided their time at a nearby roadside diner and returned to the rear of the building at about 9 P.M. Tremper left Baechlor and Flanagan there and returned for them at about 9:40 P.M. Baechlor then told him that he and Flanagan had opened the safe and taken a few hundred dollars from it. Tremper received $26 of the proceeds.
Flanagan, who was called as a witness for the State, had a lapse of memory on the stand. He recalled that he entered the Lumber Company, probably from the rear, but did not recall how this was accomplished. He recalled that some one entered with him and helped him open the safe, but he did not recall who that was. He did not recall their earlier arrival, later return to the scene, or waiting at a diner during the interim. He did not recall how much money was discovered in the safe. He could not identify a crowbar, found at the site, as having been brought there by him, although he did recall bringing two bars upon the premises. He did not recall moving a typewriter which was located atop the safe. He did not recall whether, upon *384 leaving the premises, he climbed a fence. He recalled that Tremper was waiting in a car for him after the safe robbery and that he and an unidentified third person left with Tremper. Thereupon, the prosecutor's examination proceeded as follows:
"Q. The person that was with you that you don't recall who it was, other than Donald Tremper who was driving the car? A. That is right.
Q. Do you recall whether he was a stranger to you or not? A. I don't think he was a stranger.
Q. You don't think he was a stranger? You had seen him before and knew him before? A. Yes.
Q. Where did you meet him on September 28? A. He was brought over to me by Tremper.
Q. He was brought over by Tremper? A. That is right.
Q. Did you know this person? A. What do you mean by knowing him? He might have been an acquaintance of mine.
Q. Was he an acquaintance? A. I had been out with the party on a previous occasion.
Q. Where did you go with him? A. Where did I go?
Q. Yes. You had been out with him on a previous occasion?
A. I went out on another job with him, another safe job.
Q. Was it a safe job that you went out on with him? A. Yes.
Q. In other words, you had done a safe job with this other person and you did this safe job with this person? A. That is right.
Q. And you don't recall who it is? A. No.
Q. Do you recall being questioned by Trooper Alvin Hammond of the State Police? Do you recall being questioned by this gentleman?
A. I recall speaking to this man, but I was under the impression he was one of the troopers that came to my house.
Q. Yes, he is a trooper. Do you recall speaking to him? Do you recall telling him about this safe job that you had been on?
Mr. Manzione: I have to object to this. This man has given no testimony injurious to the prosecutor's case. All he is saying is he doesn't recall, and similar statements. Now, if he is attempting to impeach his own witness by prior inconsistent statements, I think the matter is objectionable. If he had given injurious testimony, I think it would be otherwise.
The Court: I will allow the question.
By Mr. Kolodziej: Q. You spoke with Trooper Hammond?
The Court: He said he did.
Q. Did you tell Trooper Hammond the person that was with you that night? A. I don't recall that, either.
Q. You don't recall? Did you tell Trooper Hammond that Mr. Baechlor was with you? A. No, I don't recall saying that.
Q. I beg your pardon? A. I don't recall saying that.
Q. Could you have told him that? Is it possible that you told him that? A. I have to clarify that statement.
*385 Q. All right, go ahead. A. I was questioned on twenty safe jobs, by I would say a conservative thirty police, and what I have said or might have said I don't recall what was said in all them conversations, referring to all these safe jobs.
Q. On how many of these twenty safe jobs was this other person whom you can't remember the name of, with you? A. I didn't quite get that.
Q. You said you were questioned about twenty safe jobs. Did you commit the twenty safe jobs? A. I don't feel inclined to answer that.
Q. On how may safe jobs was this other person?
Mr. Manzione: I have to object. My client is on trial for a specific instance here. The prosecutor is fishing all over the place. What this man has done in the past certainly has no bearing on my client's position here today."
The prosecutor thereupon voluntarily discontinued this line of examination.
The entire cross-examination of this witness follows:
"Q. Do you recognize the man who was with you that night in this courtroom today? A. I don't recall who was with me."
Trooper Hammond was called and testified concerning the condition of the premises when he arrived on the scene on Monday, October 1, 1956. He recounted his interview with Flanagan, over objection of defense counsel. Flanagan, he testified, told him that he, Baechlor and Tremper did the job. Flanagan was taken to the scene and indicated to the trooper how the entrance had been accomplished. The court properly charged the jury that this testimony was admitted for the sole purpose of neutralizing Flanagan's testimony.

I.
Defendant first asserts that it was prejudicial error to permit Flanagan to testify that a person whose name he did not remember had been with him on another safe robbery. His point is "that there is no question that the unnamed person referred to by Flanagan was already identified by Tremper as the defendant Baechlor," and that this testimony by Flanagan permitted the State to place the defendant's character in issue before defendant had elected to *386 introduce testimony as to his character. He cites as authority State v. Samurine, 47 N.J. Super. 172 (App. Div. 1957), reversed on other grounds 27 N.J. 322 (1958), and State v. D'Ippolito, 19 N.J. 540 (1955).
There is no doubt that in a criminal case the State cannot offer evidence of the character or reputation of the defendant unless defendant first raises that issue. State v. D'Ippolito, supra, 19 N.J. at page 546, and cases cited.
In the Samurine case, the State's witness, a lawyer, and the person from whom it was alleged defendant had obtained money under false pretense, twice referred to Samurine's criminal past as a factor in moving him to consult the prosecutor. This court found that these references "were gratuitous if not deliberate, coming as they did from the mouth of a lawyer," and that neither the striking of these remarks from the record nor the cautionary instruction by the trial court to the jury would cure their possible prejudicial influence.
In the D'Ippolito case the issue of defendant's character was raised by the prosecutor in his summation to the jury. The prosecutor commented on defendant's failure to call witnesses to testify as to his good character. The Supreme Court reversed the conviction. It found that the prosecutor, in commenting as he did, was attempting to do indirectly what he could not do directly, and had thereby prejudiced D'Ippolito's right to a fair trial.
Here, however, the circumstances are completely distinguishable from those in both cited cases.
First, the effect of Flanagan's testimony was a refusal to identify the defendant as the accomplice who had broken and entered the premises with him. His repetitious answer was that he did not remember who had so accompanied him. Upon cross-examination, when asked whether he recognized "the man who was with you that night in this courtroom today?" he answered, "I don't recall who was with me." This, in effect, was a denial that defendant, who was in attendance at the trial, was the person who accompanied him. Thus, Flanagan did not testify directly or even inferentially *387 that the defendant was the person who had aided him in the commission of the crime charged, or that defendant was the person who had committed criminal acts with him in the past. Contra-wise, implicit in Flanagan's testimony is the conclusion that the defendant was not the accomplice to the crime to which Flanagan had pleaded, but rather that it was some third person who had, in the past, committed other criminal acts with him.
Second, it should be noted that the initial testimony given by Flanagan, in which he referred to having been "on another job with him," was a non-responsive answer which would not normally have been elicited by the question propounded by the prosecutor and which he could not have anticipated would be forthcoming. The statement of "another job" was volunteered by Flanagan, who was a non-cooperative, if not an antagonistic, witness.
Third, the same is true of the original reference to "being questioned on twenty safe jobs." After Flanagan volunteered the information that he had been questioned by the police concerning 20 "jobs," the prosecutor posed the question as to whether the unidentified third person had, as well, been concerned therewith. Flanagan first replied that he did not understand the question. After the question was repeated the trial court made no ruling on defendant's objection, but defendant did not answer the question.
It is again apparent that this reference to the "twenty jobs" resulted from a non-responsive reply of the witness Flanagan and did not refer to this defendant. The prosecutor was not seeking to prove prior criminal acts of the defendants. He was not attempting, by indirection, to place defendant's character or reputation in issue. The question not having been answered, no prejudice resulted in any event.
Additionally, there was no objection or motion to strike the testimony initially volunteered by Flanagan concerning "another job." Nor did defendant request that any instructions be given the jury in reference thereto.
In such circumstances the appellate court may, under R.R. 1:5-1(a), R.R. 2:5, consider plain error, though not *388 brought to the attention of the trial court. R.R. 1:5-1(a) reads, in part:
"The court may, however, notice plain errors affecting substantial rights of the defendant, although they were not brought to the attention of the trial court. If it shall appear, after challenge interposed by the defendant in the appellate court, that the verdict was against the weight of the evidence, the judgment shall be reversed and a new trial ordered. A verdict of a jury shall not be set aside as against the weight of the evidence unless it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion."
In State v. Picciotti, 12 N.J. 205, 211 (1953), the court said:
"The trial court is entitled to be apprised of alleged errors in the conduct of a case so that it may have an opportunity of correcting them. Counsel cannot sit idly by and speculate on answers to questions or the effect of a charge and then, if the verdict goes against their client, raise in an appellate court matters which should have been complained of below. Rule 1:2-19(a) is not a haven of refuge for those who fail to comply with the ordinary rules governing criminal trials. While the case of Williamson v. Berger, 11 N.J. 500 (1953), dealt with a civil trial, what was said there concerning Rule 1:2-20(c) is pertinent here.
The rule is designed to allow the appellate court to consider plain error, though not brought to the attention of the trial court, when its conscience is shocked, when it is convinced that substantial justice was not done below, and that an unjust, unconscionable result was brought about by the error or errors first raised on appeal. In the instant case we find that substantial justice was done and that no harmful, prejudicial error was committed below."
So here, we find that under the particular facts and circumstances substantial justice was done and no harmful or prejudicial error committed.

II.
Defendant also argues that testimony of prior crimes is collateral to the issue being tried and is not admissible to prove the commission of the crime charged except in certain limited circumstances. What has been said above is as well dispositive of this ground.

*389 III.
Defendant next urges as error the admission of Trooper Hammond's testimony relating to conversations with Flanagan in which the latter allegedly identified Baechlor as his accomplice.
Defendant argues that by this testimony the State sought to corroborate the witness Tremper by the use of hearsay testimony.
When a party is surprised by harmful adverse testimony given by his own witness in conflict with a prior statement which the witness has made, he may attempt to neutralize or discredit this evidence by showing by other witnesses a contradictory statement on a previous occasion. This is not to prove the truth of such contradictory statement, but to neutralize or withdraw the effect of the unexpected testimony. Since the prior statement is not used assertively in place of his statement on the witness stand, but merely to wipe the slate clean, it is not hearsay testimony. The court must instruct the jury that the receipt of such testimony is purely for the purpose of neutralizing the prior testimony and that they must disregard it as tending to prove the truth of the facts which it asserts.
The admission of neutralizing testimony lies in the discretion of the trial judge. This discretion "relates to the question of whether, under the particular facts and circumstances of the case, justice requires that the evidence be admitted." State v. Hogan, 1 N.J. 375 (1949). The admission of such testimony should be grounds for reversal only where it appears that the trial judge abused such discretion.
In order to warrant the admission of neutralizing testimony it is essential that three conditions exist: (1) a witness must make an adverse statement contradictory of a prior statement made by him; (2) the statement must be unexpected by the party against whom it was made, i.e., he must be surprised thereby; and (3) the statement must be harmful to the party against whom it was made. *390 Defendant urges only that the statement was not harmful in that Flanagan did not deny affirmatively and specifically that defendant was his accomplice, but merely pleaded a lapse of memory, the result of which was neither an affirmance nor a denial that defendant was such accomplice.
State v. Kysilka, 85 N.J.L. 712, 714 (E. & A. 1914), the court said:
"If it is apparent to him that there is no actual `surprise,' and that the real purpose of offering the evidence is to get the benefit of hearsay testimony as having probative force, or that the injury resulting from the `surprise' is fanciful rather than real, he should refuse to admit the evidence; but where its admission seems to him necessary in order to guard against a miscarriage of justice, he should give ample warning against its consideration by the jury except for its limited purpose."
See also, State v. D'Adame, 84 N.J.L. 386 (E. & A. 1913).
In State v. D'Adame, supra, the defendant was being tried for receiving stolen goods. The facts, as recited by the court, 84 N.J.L. at page 388, were:
"The goods in question consisted of copper wire, which two boys, Knight and Mahon, had cut from the telegraph poles of the Lehigh Valley Railroad Company. Upon information received from a third boy, a warrant was sworn out for Knight and Mahon, and two days after the theft Officers Miller and Autobato arrested them. They admitted the theft at once, and upon the trial of D'Adame, testified that they had sold the wire to him at his house on Miller street, Newark. While on the stand, Mahon pointed out and identified D'Adame as the man who bought the wire from them; but Knight, when asked to do so, pointed out another man, and said he was one of the men that was there, but that he did not see the other man in the court room. The man who was pointed out by Knight as one of the men was not D'Adame, and, in fact, took the stand and swore he had never been at the Miller street house. The officers who arrested the boys, Knight and Mahon, two days after the crime in question were then called and both testified that they took Knight, immediately after arresting him, and when he admitted stealing the wire, to D'Adame's house, and that in the presence of D'Adame, Knight had pointed out D'Adame and said he was the man who bought the wire."
Speaking to the same issue which defendant has raised on appeal, that court said, 84 N.J.L. at page 394:
*391 "We think, however, that the evidence was admissible for another purpose, and that was as tending to neutralize, i.e., to `discredit,' the adverse effect of Knight's unexpected failure, when testifying for the state, to identify the defendant. The effect of this failure of Knight to identify D'Adame, who was sitting in full view of the witness and of the jury at the trial, was practically the same as if Knight had pointed to D'Adame and said, `This is not the man.' The state therefore was placed in the unexpected position of having offered evidence to the jury that the defendant was not the man who committed the crime. It had no reason to expect such a situation; for Knight had previously said that defendant was the man who committed the crime. The evidence was therefore clearly a `surprise.' The state, having been thus surprised into offering evidence, the effect of which was exactly contrary to what it was endeavoring to prove, viz., the guilt of the defendant, had the right, if it could do so, to neutralize the effect of such evidence by proving the self-contradictory statements of the witness to show that such evidence was untrustworthy."
See also, State v. Cooper, 10 N.J. 532, 560 (1952).
Defendant, however, urges that State v. Perillo, 18 N.J. Super. 549 (App. Div. 1952), makes such neutralizing testimony as here given inadmissible. In that case the court said, 18 N.J. Super. at page 550:
"The conviction of the appellants, Joseph and Julia Perillo, was based in large part on hearsay evidence. They were tried on an indictment charging that they and one Salvado conspired to keep a bookmaking establishment at 7 Nicholson Street, Lodi. The State readily proved that bookmaking was carried on at the address mentioned but had difficulty in connecting the Perillos with the enterprise. To this end, the deputy attorney-general presented a witness, Brown, who testified that he had questioned a prisoner in the State Prison, named Bucaro. Over objection of the appellants, he was allowed to state that Bucaro had said that Joseph Perillo operated at 7 Nicholson Street `the biggest horse room in Lodi'; that it was open every night, and that about a hundred people would be there. Mr. Brown also testified that shortly after this interview, Bucaro sent him, through the mails, a list of alleged gambling resorts in Lodi. This list the court received in evidence.
The excuse given for offering and receiving the hearsay evidence was to neutralize parts of the testimony of Bucaro who himself testified for the State. Bucaro testified that `the biggest horse room in Lodi' was `right next to Pudgy's Lunch at 11 Nicholson St.' Asked if Perillo did not operate it, he replied, `I wouldn't know, sir.' The deputy attorney-general claimed surprise and called Brown to the stand." (Emphasis supplied.)
*392 The court specifically found that the purpose of the testimony was to prove the essential elements of the crime charged, rather than to neutralize Bucaro's testimony. This is made plainly evident by the use of the phrase "To this end." In effect, the appellate court concluded that the trial court had been guilty of an abuse of discretion.
An examination of the entire transcript in the Perillo case discloses that there was not only a paucity but actually a complete absence of any testimony linking Perillo with the operation of a bookmaking establishment, except for the prior hearsay statement of Bucaro. There was no other evidence which the testimony of Bucaro could have served to negate.
After recognizing the propriety of the admission of neutralizing testimony, as expounded in the D'Adame case, supra, the court said, 18 N.J. Super. at page 551:
"In the appeal before us, Bucaro's testimony that he did not know whether Perillo operated the gambling house, did not tend to establish Perillo's innocence. Whether Bucaro's failure of memory was real or pretended, is of no consequence. Since his testimony was utterly harmless, there was no legitimate reason to prove the statement which Bucaro had made at the Prison. The State relies on cases that are readily distinguishable. In State v. D'Adame, supra, although the testimony which surprised the State was in negative form, it was in practical effect the same as if the witness had said that the defendant was not the man involved in the crime. For this reason, evidence of the contradictory statement was admissible. The situation in State v. Kysilka, 85 N.J.L. 712 (E. & A. 1914), was substantially the same. In the latter case, the court emphasized that `Evidence of this character (the prior unsworn statement) is obviously extremely dangerous,' and pointed out the possibility that it may do `a much greater wrong than the one it was intended to cure.' And where it appears that `the real purpose of offering the evidence is to get the benefit of hearsay testimony as having probative force, or that the injury resulting from the "surprise" is fanciful rather than real, he (the trial judge) should refuse to admit the evidence.'"
It becomes necessary to assay the testimony in the case sub judice.
Tremper had first been called as a state witness and identified defendant as the accomplice who, with Flanagan, entered the premises in question. Flanagan was thereafter *393 called as a state witness. He refused to identify defendant as his accomplice. This was accomplished, not by a direct denial that defendant was his accomplice, but rather by a stated lapse of memory as to the identity of his accomplice. He testified on direct examination that he had no recollection of who accompanied him in his criminal undertaking. Upon cross-examination he as well refused to identify defendant when, in answer to the question "Do you recognize the man who was with you that night in this courtroom today?" he replied, "I don't recall who was with me." Flanagan admitted that he had spoken to Trooper Hammond.
Implicit in Flanagan's testimony, both upon direct and cross-examination, is a refusal to identify defendant. Since Tremper had already identified defendant this was, in effect, as in State v. D'Adame, supra, a denial that the defendant was the accomplice. Even though given in the form of a lapse of memory, this was harmful and adverse testimony in that the effect was contrary to that which the State was attempting to prove, and it was then open to the State to neutralize the effect of this adverse testimony. See State v. Bricker, Jr., 99 N.J.L. 521 (E. & A. 1924); State v. Lang, 108 N.J.L. 98 (E. & A. 1931); State v. Johnson, 73 N.J.L. 199 (Sup. Ct. 1906).
We hold, therefore, under the facts here present, that the trial court properly exercised its discretion in admitting the testimony of Trooper Hammond and properly restricted the effect thereof in his charge.
It should be noted parenthetically that the prosecutor did not plead surprise in advance of his examination of Flanagan concerning an alleged prior statement. It was not until counsel for defendant objected to questions propounded to Trooper Hammond that he pleaded surprise, and then stated that the testimony sought to be elicited was only for the purpose of neutralization.
It is a better practice to plead surprise in advance of an examination of a witness concerning a prior contradictory statement and the adduction of neutralizing testimony. However, where the element of surprise is clearly *394 evident or is otherwise made to appear, such specific plea anterior thereto is not a vital and essential prerequisite. Cf. Stappenbeck v. Jagels Fuel Corp., 131 N.J.L. 215 (E. & A. 1943).

IV.
Defendant next claims that the trial court erred in four particulars in the charge.
No exceptions were taken to the charge, nor were any requests to charge made by defendant. R.R. 3:7-7. If defendant is to succeed, it must be by reason of plain error. R.R. 1:5-1(c); R.R. 2:5.
Defendant first asserts that the trial court erred in that portion of the charge which reads:
"But, if facts are testified to which concerns the acts of the defendant, which he could by his own oath deny, his failure to testify in his own behalf raises a strong presumption that he cannot truthfully deny those facts, and may be considered by you."
The charge is in almost the identical language employed by Chancellor Walker in State v. Kisik, 99 N.J.L. 385 (E. & A. 1924). The sole difference lies in the insertion of the word "own" preceding "oath," and the substitution of the words "those facts" for "them."
It is defendant's contention that the charge should have included the words "facts which could be conclusive of his guilt."
Tremper had testified to inculpatory acts or conduct which, if true, must have been within defendant's personal knowledge and would "in some degree impute his guilt or tend to prove some element of the offense, and which facts he can disprove by his own oath as a witness if the facts be not true." State v. Costa, 11 N.J. 239, 254 (1953).
In State v. Costa, supra, the court said, 11 N.J. at page 253:
"Unlike similar statutes adopted in other jurisdictions, neither the 1871 act nor any successor legislation contains provisions prohibiting or restraining comment by a trial judge upon the failure of the *395 accused to take the stand. Accordingly, it has been settled in our State that such comment may be made in a proper case. However, the question for the appellate court always remains whether the evidence was such as to have made any comment appropriate and whether the form of the comment, if appropriate, went beyond permissible limits."
Cf. State v. O'Leary, concurring opinion, 25 N.J. 104, 116 (1957); State v. Corby, 47 N.J. Super. 493, 497 (App. Div. 1957); affirmed 28 N.J. 106, decided October 20, 1958.
We are aware that the language employed in State v. Costa, supra, State v. O'Leary, supra, and State v. Corby, supra, approved a charge where the acts of defendant were defined by some words synonymous with inculpative or imputative.
Although we do not approve the failure of the trial court to confine the words "acts of the defendant" by some phraseology limiting the denial to acts inculpative or imputative of some degree of guilt (State v. Costa, supra; State v. O'Leary, supra), the omission under the facts here present did not constitute prejudicial error.
Defendant secondly asserts that the trial court erred in its charge concerning the effect of Trooper Hammond's testimony. Considered in its context, there is found no harmful error in this portion of the charge.

V.
Defendant next urges that the trial court erred when, in charging the jury that if the value of the goods stolen was in excess of $50 it constituted a high misdemeanor, it overlooked the fact that on May 24, 1957 the statute was amended and the value which distinguishes between a misdemeanor and high misdemeanor was raised to $200. N.J.S. 2A:119-2, as amended, L. 1957, c. 56, p. 103.
Defendant was indicted by the Middlesex County grand jury during the January stated session of the Middlesex County Court. That session ran from January 2, 1957 to May 1, 1957. R.R. 1:28A. The indictment concerned a crime allegedly committed on September 28, 1956. It *396 appears, therefore, that both the alleged crime and the indictment antedated the change in the statute.
R.S. 1:1-15 reads, in part:
"No offense committed, and no liability, penalty or forfeiture, either civil or criminal, incurred, previous to the time of the repeal or alteration of any act or part of any act, by the enactment of the Revised Statutes or by any act heretofore or hereafter enacted, shall be discharged, released or affected by the repeal or alteration of the statute under which such offense, liability, penalty of forfeiture was incurred, unless it is expressly declared in the act by which such repeal or alteration is effectuated, that an offense, liability, penalty or forfeiture already committed or incurred shall be thereby discharged, released or affected; and indictments, prosecutions and actions for such offenses, liabilities, penalties or forfeitures already committed or incurred shall be commenced or continued and be proceeded with in all respects as if the act or part of an act had not been repealed or altered * * *."
The Legislature did not provide that an offense already committed should be discharged. State v. Low, 18 N.J. 179 (1955).
Defendant also contends that the trial court committed error in that it merely read the pertinent statute and did not further amplify or explain the language thereof, citing State v. O'Leary, 31 N.J. Super. 411, 417 (App. Div. 1954), where the court said:
"Since the matter is to be retried, it seems advisable to note that the charge of the court in such cases should advise the jury as to the essential elements of the crime which the State is obliged to prove, and should define those elements."
It is to be noted that the quoted paragraph refers only to the case then before the court and was obiter dicta as far as the decision was concerned. The language was employed more in the nature of advice to the trial court upon the retrial, having in mind the paucity of proof of entry. Here, however, the statutory language, viewed in the light of the evidence, was sufficiently clear so that the jury could have had no doubt of the import of the words "breaks and enters with intent to steal." The case is distinguishable from State v. O'Leary, supra. There having been neither a request to charge nor an objection to the charge, it cannot be *397 said, under the facts here present, that the failure to further define the terms "breaking, entry and intent to steal" constitutes reversible error.

VI.
Defendant further argues that the trial court improperly restricted the cross-examination of Tremper concerning his prior conviction for crime. The record discloses the following:
"Q. Mr. Tremper, have you ever been convicted of a crime? A. I have, yes, sir.
Q. On what occasion? A. On what occasion?
Q. Yes. A. On November 9, 1929, July 17 
The Court: I think the only question you are permitted to ask is `Have you ever been convicted of a crime?' If he says yes, that ends it.
By Mr. Manzione: Q. You have been indicted for breaking, entering and larceny, with respect to the Raritan Lumber Company, is that correct? A. Yes, sir.
Q. In May, did you plead to that indictment?
Mr. Kolodziej: I object to any further questions. He can ask whether he was convicted of any crime, but not 
The Court: Of course. What is the purpose of this?
Mr. Manzione: This man has gotten up here now 
The Court: Just a minute. We are not going into any discussion about it. The record indicates that he pled not guilty on March 29, 1957. Is that the date?
Mr. Manzione: I don't have it here.
Mr. Kolodziej: Yes, that is correct, I believe.
The Court: What date was it?
Mr. Kolodziej: On March 1, 1957.
The Court: Now, what was the question?
Mr. Manzione: Then I asked him what was his plea to the indictment.
The Court: What was it? All right.
Mr. Kolodziej: The defendant pleaded not guilty on May 10 to this charge.
By Mr. Manzione: Q. On May 10, 1957, you pleaded not guilty to having participated in this particular crime that you have described today? A. Yes, sir.
Q. Today you tell us that these are your words that you drove the car, is that right? A. That is right.
Q. And delivered whom in the vicinity of the Raritan Lumber Company? A. Yes, sir.
Q. Have you since changed your plea to the indictment?
A. I changed  did I change it?
*398 Q. Yes. A. Yes, I did.
Q. Where any promises or favors held out to you? A. No, sir.
Mr. Manzione: That is all."
Defendant urges that had his counsel "not been interrupted, he may have admitted a long string of them." Again, defendant's counsel neither made any objection to the ruling of the court nor any proffer of proof. The record discloses that regardless of the statement of the trial court, defendant was permitted to elicit that he was "indicted for breaking, entering and larceny with respect to the Raritan Lumber Company," his plea to that charge, his change of plea. In addition, counsel asked Tremper whether any promises or favors were held out to him for pleading to having participated in the crime with which defendant then stood charged. It appears plain that the presently urged purpose of the line of questioning is an afterthought. The initial purpose of the interrogation was to cast doubt upon Tremper's testimony by raising an inference that he had made an arrangement with the State. We find no error on this phase of the case.

VII.
Defendant finally claims that the verdict was against the weight of the evidence.
A jury may convict a defendant upon the testimony of an accomplice where, if in their judgment, it is entirely credible and worthy of belief. State v. Spruill, 16 N.J. 73 (1954).
A verdict will not be set aside as against the weight of the evidence unless it clearly appears that it is the result of mistake, prejudice, passion or partiality. State v. Rios, 17 N.J. 572 (1955).
An examination of the record discloses that the trial was full, fair and impartial, the verdict not against the weight of the evidence.
We perceive no error which requires a reversal.
Affirmed.