STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. LAURA WINTER, DEFENDANT-RESPONDENT.

Argued November 9, 1983—Decided July 2, 1984.

*Hilary L. Brunell,* Assistant Prosecutor, argued the cause for appellant (*George L. Schneider,* Essex County Prosecutors, attorney; *Hilary L. Brunell* and *Miriam Kahan Brody,* Assistant Prosecutor, of counsel and on the briefs).

*Judith L. Borman,* Assistant Deputy Public Defender, argued the cause for respondent (*Joseph H Rodriguez,* Public Defender, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

We granted certification, 93 *N.J.* 308 (1983), to review the Appellate Division's reversal, in an unreported opinion, of defendant's conviction for manslaughter, a violation of *N.J.S.A.* 2C:11-4b. The order granting certification limited the appeal to two issues: (a) What standard should a trial court apply in determining whether to issue a curative instruction or, in the alternative, to order a mistrial, when the jury has heard inadmissible, prejudicial testimony? (b) Were the curative instruc-

tions given in this case sufficient to eliminate the prejudicial impact of the medical examiner's testimony?

Our review of the record leads us to the conclusion that any prejudice caused by the witness's comment was remedied by the specific, forceful instruction given to the jury. We therefore reverse the judgment of the Appellate Division and reinstate the judgment of conviction.

## I

Defendant, Laura Winter, a registered nurse, was indicted for aggravated manslaughter, in violation of *N.J.S.A.* 2C:11–4a, arising out of the death of a patient under her care at Beth Israel Hospital in Newark. The theory of the State's case was that Winter killed the patient, Anna Mudryj, by transfusing incompatible blood intended for another patient, thereby causing a transfusion reaction in the victim. The State claimed further that defendant took steps to conceal her conduct, including failing to inform the patient's doctor of her error, secreting and disposing of the remainder of the blood upon realizing her mistake, and changing notations on Anna Mudryj's chart to mask the effects of the transfusion reaction. The defendant denied giving the transfusion.

On the last day of testimony in this lengthy trial, the State called as a rebuttal witness Dr. Robert Goode, the acting New Jersey Medical Examiner. Dr. Goode testified as to the cause of death, based on medical records, autopsy reports, witnesses' statements, and microscopic slides. Included in the statements he relied on in forming his opinion were those of Anna Mudryj's daughter, Jaroslawa Misseck, and her husband, who had related their observations of Mudryj's discomfort following the alleged transfusion of incompatible blood. On cross-examination, defense counsel asked Dr. Goode, "How do you know who the Missecks' were?" The response by Dr. Goode, as follows, gives rise to this appeal:

Originally when I was told about the case it was said that—I was told that somebody had made a complaint that Mrs. Mudryj said, "they're out to murder me," or "she's trying to murder me," or something like that. I said, "get me all the information you can," and I said, "I'll need all the statements, all of the history, all of the hospital charts, all of the autopsy reports, et cetera, to review it."

The trial court had, at the beginning of the trial, cautioned against any attempted introduction of these clearly inadmissible statements and had instructed counsel to admonish their witnesses to avoid any reference thereto. Dr. Goode, having been brought in only on rebuttal, apparently had not been so instructed. Upon hearing the Medical Examiner's digression into the area of Mudryj's alleged declaration, the court stated, "I'm going to strike the last answer of the witness." This evidently sparked a non-verbal response from defense counsel, for the court then inquired of him, "You don't want it stricken?" At that point defendant's lawyer indicated that he wished to make an application, whereupon the jury was excused and defendant moved for a mistrial, which was denied. When the jurors returned to the jury box, following a recess of five minutes, the trial court instructed them as follows:

Ladies and gentlemen, I instruct [sic] the last answer of this witness—you are to disregard the last response of this witness. You are not to consider that response, in any way, for any purpose. As I told you at the outset of these proceedings and as I have emphasized throughout the course of this trial, you are to make your ultimate decision in this case based solely upon the evidence admitted at the trial. The evidence consists of the testimony of witnesses. Now, I struck the last answer of this witness. It is not evidence in the case, it cannot have any effect or influence on you when you deliberate and reach your verdict and in no sense are you to consider that answer in making your decision. You're not to consider it, in any way. You are not to discuss it among yourselves during your deliberations. You are to totally disregard the last statement of this witness. Do you understand my instructions? The record should reflect that all the jurors are nodding their heads in the affirmative. Do each of you feel that he or she can comply with those instructions? The record should reflect that all the jurors are nodding their heads in the affirmative.

The jury returned a verdict finding Laura Winter guilty of the lesser-included offense of simple manslaughter, consisting of a recklessly-committed criminal homicide. N.J.S.A. 2C:11–4b. Defendant was sentenced to five years in the New Jersey

State Prison and fined $25.00, payable to the Violent Crimes Compensation Board.

## II

### –A–

In reversing the conviction the Appellate Division, relying on *State v. Samurine*, 47 *N.J.Super.* 172 (App.Div.1957), rev'd in part on other grounds, 27 *N.J.* 322 (1958), concluded that "the unmistakable capacity for prejudice inherent in Dr. Goode's testimony that decedent claimed she was being murdered could not be eradicated by an instruction." Our disagreement with this conclusion and with the *Samurine* principle underlies our reversal of the Appellate Division's judgment.

*Samurine* dealt with the sufficiency of curative instructions after a "gratuitous if not deliberate" allusion to the defendant's criminal record. Following his conviction for obtaining money under false pretenses, defendant claimed that the witness's testimony was so harmful that the trial court should have declared a mistrial. The witness had testified, once on direct and once on cross-examination, that he became concerned about his investment after learning about the defendant's criminal record. The trial court struck the testimony and ordered the jury to ignore it. The *Samurine* court applied the following test to determine the sufficiency of the court's instructions:

> In determining whether prejudicial testimony has been eradicated by prompt trial court action or, on the other hand, is so harmful that it cannot be eliminated except by declaring a mistrial, the burden is on the State to prove no possible injury to defendant. The criterion is not whether the evidence, shorn of the wrongful testimony, is sufficient to support a conviction, but rather whether the prejudicial remarks, viewed against the entire setting of the case, may have possibly affected the jury's deliberations. All doubts must be resolved in favor of the defendant. [47 *N.J.Super.* at 181–82.]

The Appellate Division pointed to two aspects of the case in support of its finding that the testimony "was so substantial as to warrant reversal * * *." *Id.* at 182. First, the defendant did not take the stand, and thus exposed himself to the presumption that his silence created under the New Jersey law at

the time. This failure to take the stand in addition to the witness's testimony, according to the court, raised the likelihood that the jury would "infer [defendant's] guilt of the crime charged." *Id.* at 180. Second, the court noted that when "the proof of someone's guilt is as thin as the State itself recognizes it to be, we are inclined to take the view that the references to his criminal record must have played a substantial part in the jury's considerations * * *." *Id.* at 182.

This Court, although not commenting on the test applied by the Appellate Division, was "wholeheartedly in accord" with the conclusion that the testimony was "so prejudicial that even striking [the references to the defendant's criminal record] from the record and giving cautionary instructions to the jury could not alleviate their possible prejudicial influence." 27 *N.J.* at 323. In summary, *Samurine* involved a witness's reference to a defendant's past criminal record in a case in which the evidence against the defendant was not substantial. The Court concluded that despite the trial court's instructions, the error must have affected the jury's deliberations.

–B–

In addressing the question of what standards should guide a trial court on whether to issue curative instructions or grant a mistrial, we are mindful of the dynamics that are necessarily a part of our adversary system. Not all the variables are capable of absolute control. The plain fact of the matter is that inadmissible evidence frequently, often unavoidably, comes to the attention of the jury, and the record cannot be purged of all extraneous influence. Hence, it is axiomatic that "[n]ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error * * *; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently." *Bruton v. United States,* 391 *U.S.* 123, 135, 88 *S.Ct.* 1620, 1627, 20 *L.Ed.*2d 476, 484 (1968).

The decision on whether inadmissible evidence is of such a nature as to be susceptible of being cured by a cautionary or limiting instruction, or instead requires the more severe re-

sponse of a mistrial, is one that is peculiarly within the compe-
tence of the trial judge, who has the feel of the case and is best
equipped to gauge the effect of a prejudicial comment on the
jury in the overall setting. A recognition of this discretion is at
the heart of *State v. Witte*, 13 *N.J.* 598 (1953), which upheld the
denial of a mistrial motion based on the trial court's directive to
the jury to disregard a prejudicial comment regarding organ-
ized-crime connections of various witnesses. Of the trial
court's authority in this area this Court said:

> A motion for a mistrial is addressed to the sound discretion of the court; and
> the denial of the motion is reviewable only for an abuse of discretion. The
> power is to be exercised with the greatest caution, in the furtherance of justice
> between the accused and the State. * * * Unless the vice is plainly ineradica-
> ble by an instruction to the jury, a mistrial is not allowable of right. [*Id.* at
> 611.]

Likewise, when weighing the effectiveness of curative
instructions, a reviewing court should give equal deference to
the determination of the trial court. The adequacy of a cura-
tive instruction necessarily focuses on the capacity of the
offending evidence to lead to a verdict that could not otherwise
be justly reached. *See State v. Macon*, 57 *N.J.* 325, 335 ("No
matter how a test may be stated, the question whether an error
is reason for reversal depends finally upon some degree of
possibility that it led to an unjust verdict."). However, even in
the context of an error of constitutional magnitude, this Court
has stated that "not 'any' possibility can be enough for a rerun
of the trial. The possibility must be real, one sufficient to raise
a reasonable doubt as to whether the error led the jury to a
result it otherwise might not have reached." *Id.* at 336.

When error of less than constitutional dimension is
raised, the level of error required to force a rerun of the trial is
perhaps best articulated in *State v. LaPorte*, 62 *N.J.* 312 (1973).
In *LaPorte*, a robbery case, the prosecutor made reference to a
defendant's prior arrest. A witness for the State then revealed
that the police had discovered, in the course of investigating
another armed robbery, that defendant was wanted in another
community for a robbery. *Id.* at 318. The trial court denied

defendant's motion for a mistrial and instructed the jury to "disregard the last statement made by this witness. It has nothing to do with this case and you will ignore it completely." Despite the obvious impropriety of the disclosure of the robbery, the Court found the error insufficient to warrant a new trial, noting that when an error is not of constitutional dimension, "it shall be disregarded by the appellate court 'unless it is of a nature as to have been clearly capable of producing an unjust result * * *.'" *Id.* at 318–19. As is readily apparent, this test is in sharp contrast to the *Samurine* rule, today disavowed, that cautionary instructions are inadequate unless the State can prove "no possible injury to [the] defendant." 47 *N.J.Super.* at 181–82.

–C–

In concluding that the error in *LaPorte, supra,* 62 *N.J.* 312, had been eliminated by the curative instruction, the Court emphasized the following factors:

> The trial judge immediately instructed the jury in the strongest terms to disregard the offending remark. Moreover, the evidence of defendant's guilt was so strong * * * that in the overall picture the error in question must be regarded as inconsequential * * *." [*Id.* at 318.]

Our consideration of these factors in the setting of this case leads us to disagree with the judgment of the Appellate Division, that the prejudice created by the witness's comment was not susceptible to a curative instruction.

Initially, we are at odds with the Appellate Division's conclusion that Dr. Goode's remark was "spoken with an angry and retaliatory intent." The fact that the answer was unresponsive is an insufficient base from which to draw such an inference. The trial court went to pains to place on the record its impression that the witness's statement was unquestionably "not intentional. * * * I am positive that the state medical examiner did not purposely act in a manner inconsistent with his duty." That determination is deserving of deference.

We are equally unconvinced that any damage wrought by this expert's comment was not subject to repair by the trial

court's curative instruction. Before defense counsel even objected, the court struck the offending remark. Following the brief recess during which there was a motion for mistrial, the trial court instructed the jury most emphatically to disregard the remark. The court then asked the jurors to acknowledge their understanding of its action and their ability to comply with the instruction.

In the face of the trial court's sharp and complete curative instruction, we cannot conclude that the mark made by Dr. Goode's comment was indelible. *See State v. LaPorte, supra,* 62 *N.J.* 312. The record lends no support to the suggestion that the jurors were unable to comply with the court's instruction.

### III

Finally, in light of the proof of guilt in this case, we can hardly find that the prejudicial comment had the capacity to influence the jury. The State's case, even though circumstantial, demonstrated that following the transfusion of incompatible blood, defendant took steps to conceal her conduct, including disposing of the remainder of the improperly transfused blood and changing notations on the patient's chart.

The record reveals that blood intended for a patient who had been transferred to another room was delivered to Room 608, to which Anna Mudryj was transferred after surgery. The incorrectly-delivered blood bore a slip of paper from the blood bank containing the name of the transferred patient, Marion Seymour, together with her blood type, "A-positive," and a mark crossing out Room 608, with the proper room number written above. Defendant, who was solely responsible for Anna Mudryj's care from 3:00 to 11:00 p.m., was told by a nurse who received the blood that it had been placed on the counter in Room 608.

Mudryj was scheduled to receive fresh frozen plasma, amber-like in appearance; she was not scheduled to have any red blood transfusion. Yet, during the visit of Mudryj's daughter

and son-in-law, both recalled that Mudryj was receiving two fluids intravenously—one white in color and the other red. They also testified that Mudryj was pale and shaking all over, so much so that the bed shook.

At 11:00 p.m., Nurse Patterson, defendant's replacement, observed that Mudryj was screaming in pain, that she was pale and her lips were blue. When Nurse Patterson pulled down the sheets of the bed, she observed that Mudryj was lying in a pool of blood and that the patient was oozing blood from her incisional sites and chest tubes. When Dr. Hopkins responded to Nurse Patterson's call, he ordered a transfusion reaction routine based on Mudryj's complaint of back pain, the presence of blood in a urine sample, and the patient's incisional bleeding. Because Mudryj had received Cumadin, a blood thinner, Dr. Hopkins asked defendant at that time if Mudryj had been bleeding into the pleur-evac, a device that measured blood around the heart. Defendant told Dr. Hopkins that the pleur-evac attached to Mrs. Mudryj in the operating room had broken down and that she had changed it. Dr. Hopkins testified at trial that he could recall no other occasion on which the device had failed. Although defendant claimed that she threw the device into the garbage, the pleur-evac was never found, nor was there any notation in defendant's notes that she had changed the pleur-evac.

Upon suspecting a transfusion reaction, Dr. Hopkins asked defendant for the empty bags of plasma. Defendant claimed that she had put the bags on the counter in the nurse's station, although it was hospital policy to retain empty blood bags in the patient's room for twenty-four hours after a transfusion. Defendant later told the head nurse that she had thrown the empty bags away. The empty bags were never found.

We are convinced that in these circumstances the jury finding defendant guilty of the lesser-included offense of simple manslaughter is consistent with a fastidious compliance with the trial court's order to disregard the improper remark by Dr. Goode. In light of the compelling evidence in the record,

together with the cautionary instruction of the trial court, we are unconvinced that the stricken testimony played any part in the jury's verdict. *See State v. Adams*, 50 *N.J.* 1, 4 (1967).

The judgment of the Appellate Division is reversed and the cause is remanded to the trial court for reinstatement of the judgment of conviction.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.