**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5864-17
           A-2506-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

FIRICIN AUGUSTIN, a/k/a
FIRICIAN AUGUSTIN,
FIRICON AUGSTIN,
FIRICIN AUGUSTINE, and
FIRICIN AUGUSTIN, JR.,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

GREGORY TORRES,

      Defendant-Appellant.

_____

Submitted September 28, 2021 – Decided October 26, 2021

Before Judges Fisher, Currier, and Smith.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 15-06-0468.

Joseph E. Krakora, Public Defender, attorney for appellant Firicin Augustin (Andrew R. Burroughs, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant Gregory Torres (Ruth E. Hunter, Designated Counsel, on the brief).

Appellant Gregory Torres filed a pro se supplemental brief.

William A. Daniel, Union County Prosecutor, attorney for respondent (Michele C. Buckley, Assistant Prosecutor, of counsel and on the briefs).

PER CURIAM

Defendants Gregory Torres, Firicin Augustin, and Jamar Mosby were indicted and charged with the first-degree murder of Bilal Fullman, N.J.S.A. 2C:11-3(a), second-degree unlawful possession of a weapon (handgun), N.J.S.A. 2C:39-5(b), and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). Defendants were tried together. At the conclusion of a lengthy trial that started in February and ended in April 2018, a jury convicted Torres of all the charged offenses and convicted Augustin of unlawful possession of a weapon. Mosby was acquitted. After denying the convicted

defendants' motions for a judgment of acquittal or a new trial, the trial judge sentenced Torres to a fifty-year prison term subject to an eighty-five percent period of parole ineligibility, to run consecutively to an unrelated prison term he was already serving, and Augustin was sentenced to a nine-year prison term subject to fifty-four months of parole ineligibility, also ordered to run consecutively to a prison term he was serving for an unrelated weapons offense.

Torres and Augustin separately appeal their convictions and the sentences imposed. Because they raise some of the same issues – they both argue the trial judge should have ordered a mistrial when a witness gave testimony that suggested they sold drugs at the building where the crimes took place, and they both argue the judge should have granted their motions for acquittal and a new trial – we scheduled these appeals back-to-back and now rule on them by way of this one opinion. For the reasons that follow, we affirm the convictions but remand for reconsideration of one aspect of the sentences imposed on both.

I

A

The crimes with which defendants were charged took place on December 12, 2014, at an Elizabeth apartment building known as Pierce Manor – a place, according to the testimony of several witnesses, where residents and others hung

out in the building's hallways and lobby, often smoking and "doing drugs." Some witnesses also said that dealers, including Bilal Fullman, regularly sold drugs at Pierce Manor.

Tyrone Dozier, a Pierce Manor regular, testified Fullman was "like family" to him. Even though they were competitors, Dozier explained that people at Pierce Manor "[stuck] together" and did not report each other's illegal dealings to police. Dozier said "strangers" didn't usually hang around in the building and would not have been welcome because they were not "from there."

Zumirah Brockington was the mother of Fullman's child. She and the child lived in Cherry Hill but regularly traveled to Elizabeth to visit Fullman. On December 12, 2014, when Fullman picked up Brockington at the train station around noon, he told her he wasn't feeling well. After going to the doctor, Fullman, Brockington, and the child took a cab to Pierce Manor. Once there, at around 5:30 to 6:00 p.m., they visited Fullman's grandmother, who lived in the building, and later went to the apartment of Stephanie Dozier, a friend of Fullman's. Stephanie Dozier[1] testified they arrived around 6:30 p.m. About forty-five minutes later, Stephanie and Fullman left the apartment to take

---

[1] We refer to all witnesses by their last names with the exception of Stephanie Dozier, who we refer to as Stephanie to avoid confusion with Tyrone Dozier.

A-5864-17

Stephanie's cat outside; Stephanie returned upstairs while Fullman remained outside. Stephanie testified she did not see anyone else in front of the building when she and Fullman parted. She also saw between ten and twenty people she did not recognize in the downstairs hallway.

Around that same time, Raheem Wilkins, a Pierce Manor resident, spoke with Fullman outside the building as Wilkins left with his girlfriend, Belinda Best. Wilkins testified that on his way out, he saw and greeted several people in the downstairs hallway of Pierce Manor, including Mosby, Augustin, Jumani Terrell, and Dozier. Best testified she talked to Fullman and saw Mosby, Mosby's brother Sutton West, Dozier, and others. Another Pierce Manor resident, Shamal Lee, passed through the lobby of the building on his way upstairs and saw several people there including Fullman, Augustin, West, Terrell, Michael Thompkins, and possibly Dozier.

Later, Fullman went upstairs and briefly talked to Brockington; he declined to go with her to a Chinese restaurant and went outside again. Brockington returned twenty minutes later and saw Fullman standing outside Pierce Manor. Brockington testified that Augustin was standing about ten feet away from Fullman, and that the two were arguing as she approached. She heard Augustin tell Fullman to "look at his gun" as he lifted his shirt; Brockington saw

5

the handle of a "black and silver" gun sticking out of Augustin's waistband. According to Brockington, Fullman said, "I don't care, I don't want to see [that] little shit anyway," and asked Augustin what kind of gun it was. Augustin replied that it was "a .40," and said, "but it kick up, though." Brockington explained that she thought Augustin meant that the gun "work[ed]."

Fullman and Brockington walked into the vestibule. Augustin followed and continued to argue with Fullman. Brockington testified that she saw Torres and Mosby, in the hallway, along with several others. She said Fullman took off his jacket and asked her to "hold his stuff" because Augustin "[kept] fucking with [him]" and he "want[ed] to fight." Augustin backed away, saying, "I'm not going to fight you" and then asked Brockington, who was still holding her purchase from the Chinese restaurant, for "a piece of [her] chicken." When Brockington acceded, Fullman "got mad" and told her to go back upstairs. Fullman and Augustin were still arguing when Brockington got to the elevator. Brockington waited upstairs but called Fullman at 8:17 p.m. to tell him she wanted to leave Pierce Manor. Fullman said he was "still waiting on a person to bring him the money" and once that happened they could go.

Dozier testified that at around 8:00 p.m. on December 12, 2014, he was in the lobby of Pierce Manor "counting [his] drugs." He saw Fullman standing by

A-5864-17

the front door looking outside, and he saw Torres, Augustin, Mosby, and a few others "hanging out" in the vestibule and lobby area. Dozier said he was standing across the lobby from Fullman and defendants, a little way down the first-floor hallway, but that he could see into the lobby when he looked up from his counting.

Dozier said defendants were wearing black clothing and ski masks, but the masks weren't covering their faces. He knew them from "around the neighborhood" and did not think their presence at Pierce Manor was odd "because they [were] from there," meaning they often hung around at the building. Dozier said that while he was initially watching, he did not see defendants acting "strange," and did not see them talk or argue with Fullman.

Dozier testified that, suddenly, he heard "shots go off" and looked up to see "which direction [they were] coming from." He said, "[t]hat's when I saw them, the three people with the guns." When asked to clarify, he said he saw the three defendants all holding guns, and Fullman "on the ground." He said he could clearly see defendants' faces. According to Dozier, everyone else in the lobby ran away, and he "heard more shots" as he "took off."

Dozier went outside through a nearby "side door," ran in a circle around two other apartment buildings in the complex and then stopped to look "down"

7

at Pierce Manor. He noticed the door he had exited through was "still open," and he "went down there to see like what was up." He found Fullman on the floor in the vestibule between the two sets of entry doors to the building. Two men, Thompkins and Terrell, were "checking [Fullman's] pockets." Dozier saw the two take a gun and drugs out of Fullman's pocket and run away. After that, Dozier "closed [Fullman's] eyes" and waited by the body until police arrived a few minutes later.

Brockington testified that Thompkins knocked on the door of Stephanie Dozier's apartment "ten minutes" after her 8:17 p.m. phone call with Fullman. Stephanie went to the living room, where she saw Brockington, the children, Thompkins, and Thompkins's mother, Crystal Harvey. When Thompkins said Fullman "got shot," Stephanie, Brockington, and Harvey went downstairs, where they saw Fullman's body in a pool of blood in the vestibule. Brockington and Stephanie testified they saw no other "civilians" in the hallway area. Police ordered the women to stay back to avoid touching evidence. Brockington and Stephanie returned to the latter's apartment.

Twenty or thirty minutes later, officers came upstairs and asked Brockington to bring her child and come with them. An officer took Brockington and her son to Fullman's grandmother's apartment, where they stayed until her

A-5864-17

mother arrived to get the child and a detective came to take her to the Union County Prosecutor's Office to give a statement. Stephanie said that "a little while later," someone came to her door and took her to the Prosecutor's Office, where she also gave a statement.

## B

The jury heard testimony about what happened after the shooting. Brockington testified that a few nights later, on December 15, 2014, around 3:00 a.m., she received a phone call from someone who did not identify himself but whom she knew to be Augustin because he said, "[w]hen you gave me a piece of chicken, I left." Brockington asked Augustin if he knew what had happened to Fullman, and Augustin repeated that he (Augustin) "had left." Augustin then asked her if she saw "the people that shot [Fullman]" and she said, "yeah"; when Augustin asked again she told him she was in the building but did not see the shooting. Augustin said he had been "looking for" her that day. When she asked how he could have looked for her if he took the chicken and "left," Augustin hung up. Later that day, Brockington gave another statement to police telling them about the call and giving more details about the events of December 12, including the previously unrevealed argument between Augustin and Fullman.

A-5864-17

On December 16, 2014 – four days after Fullman's death – Dozier was picked up by police on unrelated charges and taken to the Prosecutor's Office where he gave a statement about the shooting; he did not name the gunmen. Dozier was arrested again on January 5, 2015, on another unrelated charge and gave a second statement in which he said defendants shot Fullman. He also identified Mosby, Torres, and Augustin in a photo array.

Dozier testified at trial that he did not initially tell detectives defendants were the shooters because he was "scared" but, by January, he "felt like it was the right thing to do." Dozier said he did not expect to "get anything" in return but thought he would be "protected." Detective Sergeant Johnny Ho, the lead investigator, interviewed Dozier both times. He testified he told Dozier "from the very beginning" that he did not have any authority to "do anything" for him.

On April 1, 2016, Dozier spoke to Mosby's counsel and told him he had lied in his January 6, 2015 statement and wanted to "take [it] back." At trial, however, Dozier testified he lied to the attorney and the January 6 statement was truthful. He said he spoke to Mosby's counsel because he received a "Facebook message" and became concerned about continuing to cooperate with the Prosecutor's Office.

A-5864-17

Michael Luciano testified that in early February 2015 his cousin – Torres – called him and asked to stay with his family in Richmond, Virginia, for two days. Luciano had not seen Torres for several years and happily agreed. Torres arrived about two hours later and stayed for two-and-a-half weeks. Luciano testified that one evening, Torres took a phone call and, when it ended, "had his head down." He asked if anything was wrong and, after some hesitation, Torres said "he was on the run" for "a murder"; Torres said he had gone to Pierce Manor and killed Fullman, because it was "either him or me."

According to Luciano, U.S. Marshals "rushed" into his home the next day with guns drawn and held him, his wife, his two sons, and Torres at gunpoint. They arrested Torres. Luciano gave a statement the same day without revealing that Torres talked to him about Fullman's death; he explained he withheld that information because he was "scared" and just wanted to go home. At trial, Luciano said he did not remember what he said when giving the statement but maintained Torres told him he shot and killed Fullman.

C

The jury also heard forensic evidence. On December 12, 2014, officers recovered several discharged cartridge casings and fragments of lead projectiles from the vestibule of Pierce Manor, including casings from .25 caliber and .38

11

caliber/9 millimeter bullets. Bullets of these types were also retrieved from Fullman's body. Forensic analysis determined that all the .25 caliber bullets were fired from one weapon, and all the .38 caliber bullets were fired from another.

Officers also found other items in the vestibule; no fingerprint or DNA analyses were performed on these items because the vestibule was very dirty and investigators assumed no evidence could be gleaned from them.

The testimony of a medical examiner revealed that Fullman suffered wounds from eight bullets. There was no evidence of "close-range firing," such as gunpowder stippling, at the entrance sites of any of the wounds.

Officers retrieved a video from the day of the shooting from a Pierce Manor security camera located outside the building that was pointed toward its front entrance. A portion of the video, recorded between 8:41 and 8:42 p.m. on December 12, 2014, was played for the jury; it depicted three individuals running out the front door of the building and in the direction of the entrance to the apartment complex by the street. Police were unable to view video from a security camera inside the building's downstairs hallway because the lens had been spray-painted.

A-5864-17

D

The jury received in evidence a statement given by Jumani Terrell to Detective Sergeant Ho and Detective Sergeant Mike Manochio on January 5, 2015. At the outset, Detective Sergeant Ho explained that although Terrell had been arrested on an unrelated charge, he wanted to talk about Fullman's death. Ho asked Terrell whether anyone had made any promises in exchange for giving a statement, and Terrell replied, "no." Terrell then said Fullman had been stealing from "trap houses," or vacant apartments, where others, including Terrell, stored drugs and guns. He also said that others were saying Fullman "had to go" and had put a "bounty" on him because he was "a snake."

When asked what happened on December 12, 2014, Terrell said he was "in the hallway" at Pierce Manor for a while but left to stand outside. He referred to "Gregory," whose last name he did not know but later identified as Torres, who "came up to [him] and peaced [him]," then walked into Pierce Manor wearing "all black" and a ski mask. Terrell stated that Fullman "was in the hallway at [Pierce Manor] with [Torres, who] ran up on him and shot him." He stated that while he was outside, he heard gunshots and saw Torres and two other masked people he could not identify run "up the side street." Terrell said he ran back to the front entrance of Pierce Manor and discovered Fullman "dead or

13

going in shock." Terrell also said that he "check[ed] up on" Fullman, and found a gun, one hundred dollars, and a drug (promethazine) in Fullman's pockets. He handed the gun to Thompkins, who was also there.

Terrell said he also saw Dozier; he walked with him "all the way down through the parking lot" away from Pierce Manor. At that point, he continued on alone and later "got high" with the promethazine he took from Fullman's pocket. When asked how he knew Torres was the one who shot Fullman despite not seeing the shooting itself, Terrell said Torres spoke to him earlier in the evening and told him Fullman was "gonna go tonight," and he saw Torres was carrying a gun. Terrell stated that a few days after the shooting he saw Torres again and asked if someone else had killed Fullman; Torres replied "nah, it was me," that he "ran up there [and] shot him." Torres, according to Terrell, also told him he had gotten rid of a gun but did not say where.

When asked by Detective Sergeant Manochio whether he was "being factual" about this account, Terrell said "one hundred ten percent." After a short break during the interview, Terrell reaffirmed that Detective Sergeants Ho and Manochio did not tell him anything or do anything to influence his statement. He also said he wanted to "keep helping" the officers and was "not gonna bullshit

[them]." Terrell stated that he "[knew] for a fact" that Torres killed Fullman, saying, "I could tell you that one hundred percent."

Also, on January 5, 2015, Terrell was presented with a photo array and asked if he recognized anyone in the photographs. Terrell asked the administrating officer whether, if he signed any photos stating he recognized someone, this information would be "seen by anybody" besides himself and the officers. The officer advised that the signed photos would "go in the case file" and "might go to the defendant as part of discovery" if there was any criminal trial in the future. During this proceeding, Terrell identified a photo of Torres as the "Greg" or "Gregory" he had referred to in his description of the events preceding the shooting, but only that he was "sixty" percent sure. The administrating officer prepared a written statement to the effect that Terrell said the man in the photo was the person he saw running away from Pierce Manor and who told him he shot Fullman. Terrell confirmed the statement was accurate but refused to sign or place his initials on the back of the photo. Detective Sergeants Ho and Manochio came back and asked Terrell why he did not sign the statement or photo; he replied, "[c]ause he can get that; that's why I didn't want to put my name on it," but he confirmed the person in the photo was the one who told him Fullman "got to go tonight." Terrell also said he told the

15

administrating officer he was only "sixty" percent sure because he "didn't want to sign it," and he was really "a hundred percent" sure.

Detective Sergeant Ho asked Terrell whether he remembered who else was in the hallway at Pierce Manor on the night of the shooting. Terrell said Augustin was there and that he saw Augustin "run out." Terrell said he was friends with Augustin and had known him "all of [his] life," and he was friends with Torres as well. He identified a photo as depicting Augustin but also refused to sign it because Augustin might see it if he was arrested.

On January 13, 2015, Terrell gave another statement in which he said Augustin and Torres were in the hallway of Pierce Manor on December 12, along with several others including Dozier, West, and West's brothers. Terrell said that at around 8:00 p.m., he was standing outside when he heard gunshots. He saw three people run out of the building. Torres was one of the three, but Terrell did not recognize the others because they had masks covering their faces. He reiterated that Torres "told [him] that he did it" afterward. Terrell again identified a photograph as being of Augustin but refused to sign it and asked Detective Sergeant Ho to cross his name off the photo. He said he saw Augustin go into Pierce Manor "around the time it happened" and that Augustin had a gun. Augustin was wearing "all black" or "dark" clothing. Terrell did not say

16

conclusively that Augustin was one of the men who exited with Torres, only that "he may have" been.

When first called to testify at trial pursuant to a subpoena, Terrell refused to speak or answer any questions. The judge warned Terrell that a further failure to comply would result in a contempt finding and ordered that Terrell, who was incarcerated on an unrelated charge, be returned to jail. Terrell refused to testify two later days, and was held in contempt. A few days later, Terrell agreed to testify if the contempt determination was purged.

Before hearing Terrell's testimony, the judge conducted a Gross[2] hearing to determine whether the State would be permitted to play Terrell's prior statements for the jury. Terrell testified that he gave two statements in January 2015 but "[didn't] recall" anything he had then said. He was given the opportunity to read parts of the statements but concluded they did not refresh his recollection. He also said he "[got] real high" before giving the statements and "[didn't] remember a lot of things." Terrell testified that he gave "false information" and "made up" his account of events. He said Detective Sergeant Ho told him if he "talk[ed] about this murder," Ho would "help [him]" "get a deal" to make some open charges "disappear." He claimed he did not recall the

---

[2] State v. Gross, 121 N.J. 1 (1990).

photo array procedures, and that he "recognized who Johnny Ho told [him] to recognize." He testified that he refused to sign any photographs or documents because he "[knew] it's bullshit."

Terrell also testified that Detective Sergeant Ho told him to "say stuff about" Torres and Augustin and urged him during breaks to say more about them. Terrell also said he attempted to "correct" his statements by later going to speak to Detective Sergeant Ho again, but Ho refused to take another statement and failed to keep his promise to help Terrell get out of jail.

Terrell also testified that he did not remember the events of December 12, 2014, that he never had any conversations with Torres about Fullman or his death, and that he did not see Torres run away after the shooting. He said he "hardly [knew]" Torres, had "never talked to that man," and had seen him only once or twice in his life. Terrell also testified he saw Fullman at Pierce Manor before his death but did not find his body or take anything from his pockets.

Detective Sergeant Ho testified that he never told Terrell he wanted him to give information against defendants, that he did not make Terrell any promises regarding other pending charges, that he had no authority to make such a promise, and that Terrell's demeanor during his two statements did not suggest he was under the influence.

E

Defendants neither testified nor called any witnesses.[3] Instead, they presented their theory of the case by attempting to cast doubt on the witnesses' inculpatory testimony by pointing out discrepancies between their trial testimony and their earlier statements to police and by referencing the witnesses' criminal records to suggest they were not law-abiding people or may have lied to receive more favorable treatment in their own matters. Torres's counsel also elicited testimony from Brockington that she did not know Torres well, although she maintained she saw him in the hallway of Pierce Manor during Fullman's argument with Augustin. Among other efforts to challenge the testimony of witnesses, defense counsel elicited from Dozier a statement that he intentionally gave incorrect information to prosecutors in an unrelated homicide case in the hope that this would induce police to release his girlfriend from jail. Defendants' cross-examination of Dozier highlighted this previous falsehood, the inconsistencies in his statements at different times, and the possibility that he may have implicated defendants to obtain some beneficial treatment in his own matters.

---

[3] Mosby, who was acquitted of all charges, also chose not to testify and offered only some non-testimonial evidence.

A-5864-17

In addition, the defense elicited testimony from witnesses about the other individuals in the hallway of Pierce Manor around the time of the shooting. For example, Dozier testified that Fullman had had "beefs," or disputes, with other drug dealers and had stolen others' drugs.

F

As noted above, Torres was convicted of murder and the charged weapons offenses, Augustin was convicted of unlawful possession of a weapon, and Mosby was acquitted of all charges.

II

In appealing, both Torres and Augustin argue the trial judge erred in refusing to grant a mistrial after Dozier, in his testimony, suggested defendants sold drugs at Pierce Manor. They claim this testimony was improper evidence of past or other criminality, that it was highly prejudicial, and, even if admissible, the judge's curative instruction was insufficient. We disagree in all respects.

The decision to grant or deny a mistrial "is entrusted to the sound discretion" of the trial judge, who is both "in the best position to gauge the effect of the allegedly prejudicial evidence" and entitled to deference "absent an abuse of discretion that results in a manifest injustice." State v. Harvey, 151 N.J. 117,

20

205 (1997). A mistrial is "an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting Harvey, 151 N.J. at 205). In fact, if there is "an appropriate alternative course of action," State v. Allah, 170 N.J. 269, 281 (2002), such as the use of "a curative instruction, a short adjournment or continuance, or some other remedy," State v. Smith, 224 N.J. 36, 47 (2016), a mistrial is not a proper exercise of discretion.

In making the decision, judges must consider that trials are "often unpredictable," and that "even the most precise question" by an attorney "may bring an unexpected response from a witness" that allows inadmissible evidence to come to the jury's attention. Yough, 208 N.J. at 397. Even when improper conduct elicits the inadmissible information, a mistrial will not be warranted unless there is a clear showing that the defendant suffered actual harm. State v. LaBrutto, 114 N.J. 187, 207 (1989). The information should not provoke a mistrial if it is likely that "the results of the trial would have been the same" and its revelation did not "deprive [the] defendant of a fair trial." State v. Camacho, 218 N.J. 533, 554-55 (2014).

A judge should also consider whether the harm caused by an inadvertent revelation of inadmissible evidence can be alleviated by a "directive to the jury

21

to disregard a prejudicial comment." State v. Winter, 96 N.J. 640, 646-47 (1984). The adequacy of the instruction "necessarily focuses on the capacity of the offending evidence to lead to a verdict that could not otherwise be justly reached." Id. at 647.

Although compliance with a direction to avoid consideration of other bad acts may prove difficult for the average juror, a curative instruction may be sufficient if it strongly cautions against the use of the material to prove a defendant's disposition to commit the charged offenses. State v. Stevens, 115 N.J. 289, 309 (1989). For example, in Winter, 96 N.J. at 644-49, the Court concluded that a mistrial was unnecessary when a witness unexpectedly revealed information the trial judge had previously ruled inadmissible. The judge struck the offending remark and after a recess to address the defendant's mistrial motion, "instructed the jury most emphatically to disregard" the inadvertent testimony completely. Id. at 649. The Court found that although the stricken testimony was prejudicial, it did not have the capacity to influence the jury to the degree required to find that a mistrial was erroneously denied. Ibid.

Defendants' requests for a mistrial had their genesis when Dozier testified he did not find it unusual defendants were in the lobby of Pierce Manor on December 12, 2014, because they were "from there."  When the prosecutor asked

whether he meant that defendants lived in the building, Dozier replied, "[t]hey be up there." Asked to further explain what he meant, Dozier said, "[h]ang around, chill out there, <u>sell drugs out there</u>" (emphasis added).

Mosby's counsel immediately objected. At sidebar, the prosecutor told the judge she "didn't anticipate" Dozier would say defendants "dealt drugs" and had not intended to present any evidence to that effect; she asked the judge to strike Dozier's answer and issue a curative instruction. Defendants argued a mistrial was necessary because Dozier's answer violated their right to a fair trial by suggesting they were engaged in another uncharged wrongdoing.

The judge denied the motions for a mistrial and said he would give a curative instruction. Defense counsel discussed the contents of the instruction with the judge, asking that he state that jurors were not to consider Dozier's comment about drug dealing for any purpose, that there was no evidence that defendants engaged in any drug transactions at Pierce Manor, and that there were no drug-related charges in the indictment. The judge agreed and instructed the jury as follows:

> Ladies and gentlemen, the prosecutor . . . asked a question of the witness and that question was: "Could you explain for the jury what it means to 'be up there?'" And the witness, Mr. Dozier said, "Hang around, chill out there, sell drugs out there."

A-5864-17

I am instructing that you disregard a portion of that answer. You are to disregard that portion of the answer "sell drugs out there." There is absolutely no evidence in this case whatsoever anywhere that any of the defendants in this case, Mr. Mosby, Mr. Augustin or Mr. Torres ever, ever sold drugs or were in possession of drugs, so it's not in the case. There is no evidence in the case.

So although you heard this witness say that, I am instructing you to disregard that answer. You cannot consider that portion of the answer in your deliberations. Those words, "sell drugs out there." Disregard it. Even though you heard it, block it out of your mind. Decide this case based on the admissible evidence in this case and the admissible evidence only.

. . . .

And when I say that, I mean, at Pierce Manor or anywhere else. There is just no evidence in the case of that, okay? You have to follow my instructions and I know you have been thus far so just continue to do so. Thank you.

We are satisfied that Dozier's extraneous comment did not have the capacity to influence the jury toward a verdict it would not otherwise have reached. Winter, 96 N.J. at 649. Like Winter, the prosecutor here did not intend to elicit the impermissible testimony from Dozier, and the judge not only immediately struck that testimony but forcefully instructed the jury to disregard it as well. The court's curative instruction contained all the information defendants requested. This instruction was sufficient to cure any prejudice, and

24

therefore the trial judge did not abuse his discretion in concluding a mistrial was unnecessary.

## III

Both defendants argue the trial judge erred in denying their motions for acquittal and a new trial. Torres argues the evidence against him, even giving the State all beneficial inferences, was insufficient to support his convictions for murder and weapons offenses. He asserts: (1) Brockington mainly implicated Augustin by saying she saw Augustin with a gun; (2) Dozier was an unreliable witness, with a motive to lie, whose statements to police and at trial differed over time; and (3) Luciano's testimony about a purported confession was uncorroborated. Torres also alludes to evidence that many individuals arrived and departed from Pierce Manor around the time of the crime, contending that the record did not establish beyond a reasonable doubt that he and not someone else shot Fullman. Augustin argues his conviction of unlawful possession was not supported by sufficient evidence since the State never produced the handgun he allegedly possessed, and no bullets or casings of a caliber matching the gun Brockington described were found at the crime scene.

Rule 2:10-1 declares that a trial judge's denial of a motion for acquittal or a new trial "shall not be reversed unless it clearly appears that there was a

A-5864-17

miscarriage of justice under the law." When reviewed, deference must be given to "the views of the trial judge, at least as to the credibility and demeanor of witnesses and [the trial judge's] general 'feel of the case.'" State v. Muniz, 150 N.J. Super. 436, 444-45 (App. Div. 1977). We are also not to overturn a denial of a motion for acquittal or new trial, and thereby overturn a jury verdict, merely because the jury may have found otherwise under the same evidence. State v. Smith, 262 N.J. Super. 487, 512 (App. Div. 1993).

Rule 3:18-1 states that a trial judge may enter a judgment of acquittal if, at the close of either the State's case or after all evidence has been submitted, "the evidence is insufficient to warrant a conviction." A trial judge may also, in applying Rule 3:20-1, grant a new trial "if required in the interest of justice." But a trial judge may not set aside a jury verdict as against the weight of the evidence "unless, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a manifest denial of justice under the law." Ibid. The standards for a motion to acquit and a motion for a new trial are "the same," Muniz, 150 N.J. Super. at 439, and, on review, we apply the same standard as the trial court, State v. Fuqua, 234 N.J. 583, 590 (2018).

A motion for acquittal should be denied if

[t]he evidence, viewed in its entirety, be it direct or circumstantial, and giving the State the benefit of all of its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, is sufficient to enable a jury to find that the State's charge has been established beyond a reasonable doubt.

[State v. Kluber, 130 N.J. Super. 336, 341-42 (App. Div. 1974).]

The "critical inquiry" is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). When reviewing the prosecution's case, a trial judge must consider "only the existence" of testimony and evidence favorable to the prosecution's position, not the "worth, nature, or extent" of such evidence. State v. Brooks, 366 N.J. Super. 447, 453 (App. Div. 2004) (quoting Kluber, 130 N.J. Super. at 342). "No distinction is made between direct and circumstantial evidence," and the favorable inferences that may be drawn from the evidence "need not be established beyond a reasonable doubt." State v. Tindell, 417 N.J. Super. 530, 549 (App. Div. 2011).

In ruling on the motion, the trial judge must not "act[] as a factfinder." State v. Williams, 218 N.J. 576, 595 (2014). For example, in Kluber, 130 N.J. Super. at 341, the trial judge granted a motion to acquit by finding a witness's

27

prior statement to police "should not be given any weight in view of his contrary testimony" at trial. We reversed, finding the judge "did not apply the proper standard" but instead "improperly weighed the evidence and disregarded the logical inferences which reasonably could be drawn therefrom." Id. at 342.

When the State rested, defendants moved for a judgment of acquittal. Augustin's counsel argued that the only witness who testified clearly that Augustin was present during the shooting was Dozier, whose testimony and prior statements to police were inconsistent. He also argued that while Brockington testified she saw Augustin with a .40 caliber gun, the bullets or casings retrieved from the crime scene and Fullman's body were not of that size. Torres's counsel argued there was "no physical evidence" linking Torres to the crime, specifically that there was "no DNA" and "no gun that was produced with his fingerprints on it." He further contended that Luciano's testimony that Torres confessed to a homicide was uncorroborated, Terrell's testimony undermined the credibility of his prior statements about Torres's involvement, and Dozier's inconsistent statements and testimony were insufficient to support a conviction.

In considering these motions, the judge found that witnesses placed each defendant in the downstairs hallway or lobby of Pierce Manor at or near the time of the shooting. He specifically noted that Brockington testified Augustin had a

gun and argued with Fullman shortly before Fullman's death, and that Torres was in the hallway around that time. The judge also noted that other witnesses saw Augustin there, that Dozier testified he saw Torres, Augustin, and Mosby all holding guns and shooting Fullman, and that Luciano testified Torres told him he was "on the run for murder" and killed Fullman.

The judge recognized that many of the State's witnesses "at times" gave "inconsistent testimony," and that there were "certainly issues of credibility," but he hewed to the applicable standard that the State be given the benefit of all its favorable testimony and all the favorable inferences that reasonably could be drawn therefrom. In applying that standard, the judge concluded "a reasonable jury could find guilt of the charges beyond a reasonable doubt, not that a jury would, but a reasonable jury could," and denied the motions for acquittal.

Defendants renewed their motions for acquittal and moved as well for a new trial after the jury rendered its verdict, reprising their earlier arguments. Augustin's counsel again argued that Brockington's testimony that she saw Augustin with a gun was uncorroborated by "ballistic evidence" and Torres's counsel asserted that the "only real testimony" that linked Torres to Fullman's death was Luciano's, which was uncorroborated by any other testimony or "physical evidence." The judge again outlined all the State's evidence against

Augustin, including Brockington's and Dozier's testimony that they saw him with a gun, and found a jury could properly have convicted Augustin of unlawful possession of a weapon. For Torres, the judge stated it was up to the jury to determine the credibility of Luciano and the other witnesses who linked Torres to Fullman's death. In further concluding the jury's verdict was not "a manifest denial of justice," the judge denied the motions.

The trial judge applied the correct standards and soundly denied defendants' motions. We find insufficient merit in defendants' arguments to warrant further discussion in a written opinion. R. 2:11-3(e)(2). We add only, with regard to Torres, that while Brockington's testimony focused on Augustin, there was sufficient testimony from other witnesses placing Torres at the scene of the crime and implicating him in Fullman's homicide, as outlined by the trial judge. Although Dozier did not implicate defendants until his second statement to police, the trial judge properly refrained from judging his credibility and instead gave the State the benefit of the most favorable interpretation of his statements and testimony. Luciano's testimony that Torres confessed to him that he shot Fullman was not directly corroborated, in the sense that no one else said they heard that particular confession, but the record also contained Terrell's prior statement that Torres told him he was going to and then did kill Fullman, and

Dozier's account that he saw Torres shoot the victim. Finally, although there was testimony that others were at the crime scene, there was no evidence in the record suggesting any of them killed Fullman. The judge was required to give the State the benefit of all reasonable favorable inferences from the evidence, which implicated defendants; the judge was not permitted to speculate that perhaps another person or persons shot Fullman. In short, the judge recognized it was for the jury to determine the credibility of the witnesses and the persuasiveness of what those witnesses said.

As for Augustin, the State was not required to present the actual handgun to sustain a conviction for its unlawful possession by Augustin. Brockington testified she saw him with a gun, and so did Dozier. A jury could reasonably infer from this testimony that Augustin indeed had a firearm on the day in question, and the judge therefore properly found this was sufficient to support his conviction if the jury credited that testimony. See State v. Bunch, 180 N.J. 534, 549 (2004).

The trial judge correctly denied defendants' motions for acquittal or a new trial both before and after the verdict.

A-5864-17

IV

Torres raises numerous issues that Augustin did not raise or that have no bearing on Augustin's conviction. These arguments include Torres's contentions that: (a) the judge should have instructed the jury about lesser-included offenses; (b) the judge should have instructed on self-defense; (c) Luciano's testimony that his home was invaded by U.S. Marshals substantially outweighed its minimal probative value; (d) the judge's Gross analysis was flawed and that Terrell's prior statements should not have been admitted; (e) the prosecutor engaged in misconduct in her opening and closing statements; and (f) reversal is required due to cumulative error. We find insufficient merit in these arguments[4] to warrant further discussion in a written opinion, R. 2:11-3(e)(2), adding only the following comments about each.

A

Torres argues, for the first time, that the trial judge erred by failing to instruct the jury on the lesser-included offenses of aggravated manslaughter, manslaughter, and passion-provocation murder, and that he failed to instruct the

---

[4] We also note that Torres filed a pro se brief in support of his appeal. We find any arguments presented in his pro se brief that may be discernibly different from those contained in his attorney's brief are of insufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

jury on self-defense. Torres concedes he and the other defendants asked that these charges not be given, adopting instead an "all or nothing" strategy. Nevertheless, he argues the trial judge "had an independent obligation" to issue instructions about these lesser-included offenses notwithstanding.

Torres asserts there was sufficient evidence to suggest that Fullman possessed a gun at the time of the crime, got into an argument with Augustin, and "may have fired the first shot." He contends that, based on the record, the jury could have found he: "recklessly shot Fullman, either in response to Fullman's actions or a fight between Fullman and [Augustin]; shot his gun in reaction to Fullman first shooting his gun; accidentally shot Fullman; shot Fullman in the heat of passion; or shot Fullman justifiably in self-defense." He argues that instead, the jury was given the "unreasonably limited choice" of either convicting him of murder or acquitting him. Torres further argues that this error was "exacerbated" by the judge's failure to properly charge the jury on accomplice liability, specifically by not instructing that Torres may have acted as an accomplice and "could have had a purpose to commit a different, lesser crime" than the principal or principals.

"It is axiomatic that appropriate jury instructions are essential for a fair trial," State v. Ball, 268 N.J. Super. 72, 112 (App. Div. 1993), and erroneous

A-5864-17

jury instructions are "poor candidates for rehabilitation under a harmless-error analysis," State v. Rhett, 127 N.J. 3, 7 (1992), and "excusable only if they are harmless beyond a reasonable doubt," State v. Vick, 117 N.J. 288, 292 (1989). But, when a defendant does not request an instruction or object to the lack of one, a trial judge's actions are reviewed under a plain-error standard. State v. Cole, 229 N.J. 430, 455 (2017); R. 1:7-2; R. 1:8-7(b). So, the judge's decision "not to charge the jury sua sponte" on an issue does not merit reversal unless "clearly capable of producing an unjust result." R. 2:10-2.

Turning first to the argument about the judge's failure to sua sponte charge lesser-included offenses, we recognize that a defendant may be convicted of an offense which is "included" in a charged offense. N.J.S.A. 2C:1-8(d). Relevant here, an offense is included if it "is established by proof of the same or less than all the facts required to establish the commission of the offense charged" or if it "differs from the offense charged only in the respect that . . . a lesser kind of culpability suffices to establish its commission." Ibid.

Torres was charged with "purposely" or "knowingly" causing death or serious bodily injury resulting in death. N.J.S.A. 2C:11-3. Aggravated manslaughter occurs when the actor "recklessly causes death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-

4(a)(1). And manslaughter occurs if the death is caused "recklessly." N.J.S.A. 2C:11-4(b)(1). Additionally, a homicide which would otherwise constitute murder is manslaughter if "committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). Torres argues that the judge should have instructed the jury on these lesser-included types of homicide in addition to purposeful or knowing murder for which he was charged.

A trial judge, however, must not instruct a jury that it may find a defendant guilty of a lesser-included offense "unless there is a rational basis for a verdict convicting the defendant of [that] offense." N.J.S.A. 2C:1-8(e). The rational basis test "sets a low threshold." State v. Carrero, 229 N.J. 118, 128 (2017). If a defendant requests a charge on a lesser-included offense, the trial judge "is obligated, in view of [the] defendant's interest, to examine the record thoroughly" to determine if the test has been satisfied. State v. Crisantos, 102 N.J. 265, 278 (1986). But "sheer speculation does not constitute a rational basis." State v. Brent, 137 N.J. 107, 118 (1994). "In the absence of a request or an objection," a "higher standard" is employed, "requiring the unrequested charge to be 'clearly indicated' from the record." State v. Alexander, 233 N.J. 132, 143 (2018). The trial judge is obligated to instruct the jury on a "clearly indicated" lesser-included offenses even if this is "'at odds with the strategic decision of

counsel.'" Ibid. (quoting State v. Garron, 177 N.J. 147, 180 (2003)). The "clearly indicated" standard does not require trial judges to "scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty," Brent, 137 N.J. at 118, or to "meticulously sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain" a lesser charge, State v. Choice, 98 N.J. 295, 299 (1985). Instead, "the evidence supporting a lesser-included charge must 'jump[] off the page' to trigger a trial court's duty to sua sponte instruct a jury on that charge." Alexander, 233 N.J. at 143 (quoting State v. Denofa, 187 N.J. 24, 42 (2006)). For example, in State v. Rose, 112 N.J. 454, 482-85 (1988), the Court found that a person firing a gun into the mid-section of another at close range "necessarily is aware that 'it is practically certain' that such conduct will cause the victim's death" and, so, found no rational basis for the trial judge there to have instructed the jury on aggravated manslaughter where the defendant did just that. See also State v. Mendez, 252 N.J. Super. 155, 161-62 (App. Div. 1991) (no rational basis to instruct the jury on reckless manslaughter as a lesser-included offense to murder where defendant fired a machine gun into a crowd, because a person taking such action "would be aware that it is practically certain his conduct will cause death" or "serious bodily injury" resulting in death).

In State v. Funderburg, 225 N.J. 66, 77-84 (2016), the Court found that the trial judge did not err in failing to sua sponte instruct the jury on passion/provocation manslaughter when the evidence of reasonable provocation did not "jump[] off the page" and where such an instruction would have potentially contradicted the defendant's theory of the case that he did not intend to injure the victim. See also State v. Galicia, 210 N.J. 364, 373-86 (2012) (holding the trial judge erred by instructing on passion/provocation manslaughter when there was no evidence of reasonable provocation and because the defendant's theory of the case was that victim's death was accidental).

In applying these principles, we first note that Torres's counsel stated that his client was not asking for any lesser-included offenses to be charged to the jury because there was "no rational basis" to do so. On the other hand, the State asked for an instruction on aggravated manslaughter, to allow jurors to find that even if only one defendant intended to kill Fullman, the others may have been reckless or intended only to cause bodily harm. The judge denied the State's request to charge on aggravated manslaughter, finding that because the sole eyewitness account was that the gunmen stood close to Fullman and shot at him, the record "rationally support[ed] no finding" other than that they "acted

deliberately and intentionally in causing or attempting to cause" his death. The judge instructed only on murder and, after the charge, counsel for Torres stated he was "satisfied" with the instructions.

As for passion/provocation, it has been held that while "a threat with a gun or knife might constitute adequate provocation" to support an instruction on passion provocation manslaughter, State v. Mauricio, 117 N.J. 402, 414 (1990), words alone do not, State v. Darrian, 255 N.J. Super. 435, 448 (App. Div. 1992). Dozier's testimony included evidence to the effect that Fullman had a gun in his possession when he was gunned down. Dozier stated:  (1) he had seen Fullman carrying a .45 caliber gun "a lot" as protection while he sold drugs; (2) when he heard the first sound of a gunshot in the vestibule he thought Fullman might have been "playing with" his weapon and accidentally fired it or fired it "just for the hell of it"; and (3) he saw Thompkins and Terrell take a gun out of Fullman's pocket after the shooting. But Dozier never said he saw a gun in Fullman's hand when he looked over and saw Fullman get shot. Forensic examination established that all the shell casings found at the crime scene matched the two types of bullets found in Fullman's body, suggesting that the only shots fired at the scene were those directed at Fullman and not fired by him.  Moreover, while there was testimony that Torres may have been present in the downstairs hallway

38

of Pierce Manor when Fullman quarreled with Augustin, no evidence was submitted by the State or defendants that Torres had any part in that argument, and mere antagonistic words from Fullman would not justify a passion/provocation instruction in any event. There is no evidence in the record that Fullman made any threat of violence toward Torres or did anything else on the evening of December 12, 2014, to "reasonably" provoke Torres to shoot him on the spot as a jury would need to find to convict Torres of passion/provocation manslaughter instead of murder.

As for aggravated manslaughter and manslaughter, we find the case similar to Rose, 112 N.J. at 482-85, and Mendez, 252 N.J. Super. at 161. Like the testimony in those two cases, Dozier testified he saw defendants fire guns directly at Fullman. In addition, Terrell told police that Torres told him Fullman was "gonna go tonight." Terrell's statement, if believed, does not comport with a theory that Torres "recklessly" caused Fullman's death. And there is nothing in the record that would provide a rational basis for the judge to charge the jury on aggravated manslaughter. N.J.S.A. 2C:1-8(e). Any instruction on these lesser-included offenses would have invited the jury to speculate.[5]

---

[5] Because we find no merit in the argument that the judge should have instructed the jury on lesser-included offenses, we also find no merit in Torres's argument

## B

Torres argues that the trial judge erred by not sua sponte instructing the jury about the elements of self-defense. He argues the record was "replete" with testimony that "Fullman not only possessed and used a gun that evening, but that he may have fired the first shot." In support of this argument, Torres argues that Dozier testified Fullman had "a lot of different guns" and often carried a gun. He also testified that Fullman was in possession of a gun the day he was killed, as he had shown it to Dozier, and that the gun was stolen from Fullman after he was shot. Luciano also testified that Torres told him Fullman had a gun at the time of the shooting and that Torres said to him that it "was either him or me." Others testified Fullman was in possession of a gun at the time, and that Augustin and Fullman had argued. According to Brockington, Fullman told her "he was hot at [Augustin]." Brockington said that Fullman said "[Augustin] keeps fucking with me. He keep fucking with me since I got here. I'm tired and I want to fight him."

---

that the judge erred "in not sua sponte charging the jury as to accomplice liability for the lesser-included offenses of murder," argued for the first time in this appeal. We note that the judge correctly charged the jury on the law applicable when considering whether Torres, Augustin or Mosby were guilty of murder as an accomplice. By convicting only Torres of murder, the jury clearly found beyond a reasonable doubt that he was the principal in the commission of that crime.

N.J.S.A. 2C:3-4 provides that the use of force toward another person may be justifiable if certain conditions are met.  "Self-defense requires an actual, honest, reasonable belief by the defendant in the necessity of using force." State v. Burks, 208 N.J. Super. 595, 604 (App. Div. 1986). The justification may only be found when the force was used to protect the defendant against unlawful force by another. Ibid. (citing N.J.S.A. 2C:3-4(a)). The use of deadly force, however, is not justifiable "unless the actor reasonably believes that such force is necessary to protect himself against death or serious bodily harm." N.J.S.A. 2C:3-4(b)(2).

If no request for a self-defense charge is made, a trial judge must sua sponte instruct the jury on this justification only if the evidence "clearly indicates or clearly warrants such a charge." State v. Rivera, 205 N.J. 472, 490 (2011). A judge need not "scour the record in detail to find such support." Ibid. But a judge must "carefully refrain from preempting defense counsel's strategic and tactical decisions and possibly prejudicing [the] defendant's chance of acquittal." State v. Perry, 124 N.J. 128, 162 (1991).

Rule 3:12-1 obligates the defendant to serve written notice of an intent to rely on the self-defense justification no later than seven days before the initial case disposition conference. When a defendant fails to comply, a judge may take

41

"such action as the interest of justice requires," including refusing to allow the defendant to present evidence supporting the defense. Ibid.

Torres never served such a notice. And when the trial judge discussed the proposed jury instructions with the attorneys, Torres's counsel twice said his client did not want the judge to give the jury a self-defense instruction. The judge adhered to those requests. Because the evidence did not clearly indicate the need for such an instruction and because the omitted instruction ran counter to Torres's strategic and tactical decision, we find no error in the judge's failure to sua sponte give such an instruction.

C

Torres also argues for the first time on appeal that the trial judge should have excluded Luciano's testimony about the manner in which U.S. Marshals rushed into his Virginia home with guns drawn to arrest Torres. He asserts this evidence was irrelevant, "inflammatory," and unduly prejudicial. To understand why we find no error in what occurred, some background is required.

Prior to Luciano's testimony, the defense sought and obtained a ruling that evidence that guns and bullets were found in Luciano's house when Torres was arrested would be inadmissible. During Luciano's testimony, the prosecutor asked how Torres's visit to his home ended, and Luciano replied that "it ended

42

with U.S. Marshals." The prosecutor then asked, "[a]nd when you say, 'with U.S. Marshals,' what happened?" Mosby's counsel objected, arguing that the "generalness" of the question "[left] an opening" for Luciano to "possibly talk about things that . . . have been deemed inadmissible," and Torres's counsel added that he "[didn't] want the issue of guns to come out," referring to the guns found in Luciano's home not the guns wielded by marshals. The judge agreed these concerns were well taken and allowed the prosecutor to ask leading questions to make sure Luciano did not volunteer unwanted information. Neither Torres's counsel nor any other party objected when the prosecutor elicited the following testimony from Luciano:

> Q. [W]hen you say, [t]he U.S. Marshals, . . . just say yes or no, they came to your house, right?
>
> A. Yes, ma'am.
>
> Q. And they came in and went into your home, right?
>
> A. Yes, ma'am.
>
>    . . . .
>
> Q. And they held you at gunpoint, right?
>
> A. Yes, ma'am.
>
> Q. And your wife had to grab your child – right?
>
> A. Yes.

43

Q. – who was coming out of a bedroom – right?

A. Yes.

Q. – when the marshals rushed in, right?

A. Yes, ma'am.

Q. And they arrested Gregory Torres, right?

A. Yes, ma'am.

On appeal, a judge's evidential rulings are evaluated under an abuse of discretion standard. Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012). Such a ruling must be upheld "unless it can be shown that [it] . . . was so wide of the mark that a manifest denial of justice resulted." State v. Carter, 91 N.J. 86, 106 (1982). And when, as here, a defendant raises the argument for the first time on appeal, the matter is reviewed in search of plain error, meaning the decision will not be upset unless it was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.

The testimony now in question was offered by the prosecution to show Torres was in Virginia to avoid apprehension and it thus had "a logical connection [with] a fact in issue." State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990); see also State v. Bakka, 176 N.J. 533, 545 (2003). The details of the arrest, however, had no probative value. Nevertheless, we find no harm

A-5864-17

in the admission of those aspects of the examination quoted above because there was no objection – suggesting the defense also saw no harm – and because these minor aspects of the Virginia circumstances did not go anywhere near the heart of the matter. Moreover, the testimony elicited was not otherwise expanded upon nor did any party dwell on it thereafter. The testimony that federal marshals had their guns drawn when they entered Luciano's home did not have the capacity to generate an unjust result.

### D

Torres argues that the judge erred by allowing the State to play recordings of Terrell's prior statements to police, claiming the judge did not properly apply or weigh the factors for admitting a witness's prior out-of-court statement under Gross, 121 N.J. at 10.  We do not agree.

Under N.J.R.E. 803(a), a witness's prior statement is not excluded by the hearsay rule if the witness "testifies and is subject to cross-examination" about the statement and the statement "is inconsistent with the declarant-witness's testimony at the trial." If the statement is offered by the party calling the witness, there is a further requirement that the statement "(A) is contained in a sound recording or in a writing made or signed by the declarant-witness in circumstances establishing its reliability; or (B) was given under oath at a trial"

or other similar proceeding. N.J.R.E. 803(a)(1). Here, only subsection (a)(1)(A) is relevant.

In Gross, the Court provided fifteen factors to be considered in determining whether a prior inconsistent statement of a testifying witness was made in "circumstances establishing its reliability," 121 N.J. at 7, under N.J.R.E. 803(a):

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing contains the entirety, or only a portion [or a] summary of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducement or coercion for making the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement, and (15) the presence or absence of corroborating evidence.
>
> [Gross, 121 N.J. at 10.]

A-5864-17

The Court held that the burden is on the party offering the statement to show its reliability by a "fair preponderance of the evidence." Id. at 15. The Court declined to adopt a higher standard for admissibility, stating that under N.J.R.E. 803(a), the declarant must be subject to cross-examination, a process which "can be relied on to explore and to expose most, if not all, relevant circumstances surrounding the prior inconsistent statement." Id. at 13. It is "not critical that the fact-finder have observed first-hand a witness's statement in order to evaluate its credibility and probative worth." Id. at 14. As a result, a prior inconsistent statement is admissible so long as there are "sufficient indicia of antecedent reliability." Id. at 15.

The Gross Court further held that if a statement is admitted under N.J.R.E. 803(a), the jury should be instructed to consider the same kinds of factors as enumerated above when "assessing its credibility and probative worth." 121 N.J. at 16-17. For example, a jury "could be instructed that the witness' prior inconsistent statement under police interrogation must be carefully scrutinized and assessed in light of all the surrounding circumstances, including [the witness's] interest in giving the statement at that time." Id. at 17.

At trial, the State sought to play Terrell's two statements to detectives for the jury. At the start of the Gross hearing, the prosecutor asked Terrell whether

47

Torres told him that Fullman has "got to go" and later that he, Torres, had shot Fullman; Terrell said, "no." When questioned about the night Fullman died, Terrell responded that he "[did] not recall." He said he remembered giving a statement to police, but it was "all a lie." Terrell also said he did not remember whether he told officers that defendants were in the hallway of Pierce Manor on December 12, 2014, or any other information he gave them.

Terrell also repeatedly said his answers to the detectives' questions were lies, stating that he "was making it up as [he] went along." He claimed that Detective Sergeant Ho told him that if he identified defendants as the shooters, he would "help" him by getting drug charges against him dropped. Terrell also said that Detective Sergeant Ho told him to identify Torres as one of the shooters, and then directed him to "say stuff about [Augustin]." Terrell also claimed that he "tried to recant," but Detective Sergeant Ho would not allow him to make another statement. Ultimately, Terrell asserted, "[t]he truth is, I don't – I really don't know what happened to Bilal Fullman. I don't know. I don't remember if I was there or not. I don't know who shot that man."

Detective Sergeant Ho testified at the hearing and explained he became interested in talking to Terrell because other witnesses mentioned he was at the crime scene. He testified that during the statement on January 5, 2015, Terrell

48

was "slightly hesitant, but cooperative," that there was no time when Terrell appeared not to understand the questions he was being asked, that Terrell never appeared to be in any kind of mental or physical distress or under the influence of any substance, that Terrell was provided with food during the interview, and that the conversation between the officers was "normal" and not "contentious." Detective Sergeant Ho testified that he never told Terrell what information he wanted him to give during his statements and never told Terrell he could get any charges against him dropped or help him in any other way if he assisted with this case.

Following the hearing and Terrell's direct examination before the jury, the judge discussed the fifteen Gross factors. Among other things, the judge found that Terrell's testimony during the hearing and direct examination was "inconsistent," since at some points Terrell said he did not remember anything about what he said during his statements but at other times said he remembered Detective Sergeant Ho telling him to identify defendants and he remembered that he lied; the judge found that Terrell, "has selective recall. It is feigned selective recall in this court's conclusion." By contrast, the judge found Detective Sergeant Ho credible, and that his testimony that he did not make any promises to or apply any pressure upon Terrell was "believable." Ultimately, in

49

applying the Gross factors, the judge found the State met its burden and "established by a preponderance of the evidence that the statements were provided in circumstances establishing their reliability." The judge held that because the statements were inconsistent with Terrell's "feigned lack of recall" during direct examination, they were admissible under N.J.R.E. 803(a). Videos of the statements were played for the jury.

The judge later instructed the jurors on how they could use the statements as evidence. The judge advised that when deciding whether Terrell's statements were credible, the jurors should consider "any relevant factors" and provided the fifteen Gross factors for them to consider.

We find no error in the procedures and rulings that led to the admission of Terrell's statements and no error in the instructions provided to the jury in how to consider that evidence.

E

Torres argues, for the first time on appeal, that the prosecutor committed misconduct in her opening and closing statements. He asserts that the prosecutor "pronounced him guilty" in her opening, thus invading the province of the jurors, and that she engaged in name calling and made inaccurate factual assertions during her closing.

50

When a defendant does not object to a prosecutor's remarks when made, any asserted error must be evaluated for plain error. State v. Tilghman, 345 N.J. Super. 571, 575 (App. Div. 2001). A failure to object suggests that counsel did not believe at trial that the prosecutor's remarks were prejudicial and deprives the trial judge of a chance to take curative action. State v. Frost, 158 N.J. 76, 83-84 (1999).

We start with the premise that prosecutors are afforded "considerable leeway" in their statements when "their comments are reasonably related to the scope of the evidence presented," and they are expected to make "vigorous and forceful" arguments. Id. at 82. And, while a prosecutor must also "refrain from improper methods," State v. Smith, 167 N.J. 158, 177 (2001), it has been recognized that even when utilizing improper methods, reversal does not follow unless it can be said that the prosecutor's misconduct deprived defendant of a fair trial, State v. Hawk, 327 N.J. Super. 276, 281 (App. Div. 2000). Instead, the prosecutor's misconduct must have been "so egregious," State v. Ramseur, 106 N.J. 123, 322 (1987), that it "substantially prejudiced [the] defendant's fundamental right to have a jury fairly evaluate the merits of his defense," State v. Timmendequas, 161 N.J. 515, 575 (1999). And statements that would otherwise be prejudicial "may be deemed harmless if made in response to

defense arguments." State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011).

We assess a prosecutor's comments in the context of the entire record, State v. Nelson, 173 N.J. 417, 472 (2002), including whether the trial was lengthy and the prosecutor's remarks short or "errant," State v. Engel, 249 N.J. Super. 336, 382 (App. Div. 1991). When remarks are "only slightly improper," a jury charge that an attorney's opening and closing arguments are not evidence and should be disregarded if they conflict with jurors' recollection of events "may serve to ameliorate potential prejudice." Frost, 158 N.J. at 86-87; Ramseur, 106 N.J. at 323.

At the trial's outset, the judge informed the jury that "what is said in an opening statement is not evidence. The evidence will come from the witnesses who will testify and from whatever documents or tangible items that are received in evidence." He gave similar instructions a few days later, just before the prosecutor commenced her opening statement.

In her opening, the prosecutor made statements to which Torres now objects:

- Defendants "entered into the vestibule of [Pierce Manor] and killed Bilal Fullman."

- "It's very common to see certain people in that hallway and that's why it was very easy for Firicin Augustin, Gregory Torres, and Jamar Mosby to walk into that hallway, walk up to Bilal Fullman, pull out three guns, and fire at him, killing him."

- "[W]hat you're going to find out through the testimony is that not only was [Fullman] well known [at Pierce Manor] and that people knew him there, but that everyone involved in this case knew each other and that's how these defendants could so brazenly and boldly and with purpose walk into that hallway and corner Bilal and execute him."

- Dozier "was in the hallway on the night that Bilal was killed by [defendants]," and that Dozier "watched the defendants as they cornered Bilal, as they shot Bilal, and as they ran away."

- Because defendants were known by Pierce Manor residents, they "were able to walk in and shoot Bilal in a crowded hallway."

The prosecutor also described and emphasized Dozier's various statements to police, briefly mentioned that other witnesses saw defendants at Pierce Manor on the evening in question, stated Brockington saw a "dispute" between Augustin and Fullman "shortly before the shooting," and argued that Torres left town to stay with Luciano in Virginia until his arrest. And, near the end of the opening, the prosecutor said,

53

[A]t the end of the day, all of the evidence, every step along the way that the investigators put this case together . . . all of the evidence points to the defendants, all of the evidence takes us to where we are today right now, to this courtroom where we seek the truth. And after all that evidence is presented, you're going to have some questions that you're going to have to answer. You're going to have to decide what happened that night. You're going to have to decide what were the facts of that night. The questions you're going to have to ask yourself are this: "Am I firmly convinced that Firicin Augustin murdered Bilal Fullman?" "Am I firmly convinced that Gregory Torres murdered Bilal Fullman?" "Am I firmly convinced that Jamar Mosby murdered Bilal Fullman?"

We find nothing inappropriate in any of these statements.

To be sure, it would have been better for the prosecutor to phrase some of these comments with expressions like "the evidence will show that defendants killed Fullman" rather than "defendants killed Fullman." But similar prefaces were uttered by the prosecutor and, when considering the whole of the opening, we are satisfied that it was undoubtedly clear to the jury that the prosecutor was expressing what she believed the jury would hear in testimony, not her own personal belief about defendant's guilt. And, as quoted above, the prosecutor ended her opening by saying that the evidence in the case "point[s] to the defendants" and that it was up to the jury to decide whether each defendant "murdered Bilal Fullman."

Considering the judge's repeated comments that opening statements are "not evidence" and that the jurors were to rely on their own understanding of the evidence presented, we find the prosecutor did not exceed the bounds of proper advocacy or, even if she did, we find no deprivation of defendant's due process rights.

We reach the same conclusion with respect to Torres's arguments about the prosecutor's summation. He first argues the prosecutor engaged in improper "name-calling" and then argues the prosecutor misstated the evidence.

Although prosecutors are "expected to make vigorous and forceful closing arguments to juries," they are "not permitted to cast unjustified aspersions on the defense or defense counsel." Smith, 167 N.J. at 177. In State v. Williams, 113 N.J. 393, 455-56 (1988), the Court cautioned prosecutors that "derogatory name-calling will not be condoned" and concluded that references to the defendant as a "cancer" and "a parasite upon society" were "troubling." In other cases, it has been determined that references to a defendant as an "animal," State v. Wilson, 57 N.J. 39, 50 (1970), and a "thug[]," State v. Sheika, 337 N.J. Super. 228, 250 (App. Div. 2001), were not reversible but names like "young punk," State v. Stewart, 162 N.J. Super. 96, 102-03 (App. Div. 1978), and "hood,"

"punk," and "bum," State v. Von Atzinger, 81 N.J. Super. 509, 516 (App. Div. 1963) were.

We find nothing troublesome here. Torres argues that the prosecutor labeled him a "drug dealer," but she never directly made that statement. The argument is based on an inference that because the prosecutor stated witnesses walked through "a crowd of drug dealers," that Pierce Manor was "under the control of the drug dealers," and that defendants were "known to this neighborhood." This was hardly a direct reference to Torres as a drug dealer.

Moreover, during their closing statements, defense counsel made similar statements, referring to individuals at Pierce Manor using and selling drugs. Mosby's counsel said Dozier was "there every day or almost every day selling drugs in Pierce Manor," and more generally that "the witnesses were pretty clear that all day, all night people come in and out, people who live there, people who hang out there, people who sell drugs there." Augustin's attorney said, "[i]t's sad to say, but it seems that Pierce Manor was a place where a lot of people sold drugs, used drugs," and urged the jury to consider whether any witnesses were under the influence on December 12, 2014. And Torres's counsel argued to the jury that Dozier testified there were "all kinds of people standing out there" at Pierce Manor on December 12, 2014, "selling drugs, doing drugs," and "there

were any number of people who were standing in that hallway, selling drugs, doing drugs, walking around." Torres's counsel added: "I get the impression that in Pierce Manor, with all the drug dealing going on, it's probably not beyond the world of the extraordinary that someone has a gun and that that gun goes off."

Considering that the prosecutor's summation with respect to what was occurring at Pierce Manor was well-supported by the evidence, and considering defense counsel made similar comments about individuals in and around Pierce Manor, we find no merit in the argument that the prosecutor exceeded the bounds of proper advocacy.

Torres lastly argues that the prosecutor made misstatements of fact in her closing that prejudiced his right to a fair trial. Prosecutors, of course, "must argue based on facts in the record," Timmendequas, 161 N.J. at 595, and must not "make inaccurate legal or factual assertions during trial," Smith, 167 N.J. at 178. Instead, they are generally limited to commenting on the evidence and reasonable inferences that may be drawn from the evidence, State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997); they must not imply to the jury that they possess knowledge beyond that contained in the record, State v. Feaster, 156 N.J. 1, 59 (1998), and "may not invite the jury to speculate about facts not in evidence," McGuire, 419 N.J. Super. at 146.

Torres argues the prosecutor incorrectly stated Sutton West "vouched for" Dozier with defendants in summation. Whether that statement about what the testimony revealed was accurate is debatable. Nevertheless, in the context of the rest of the summation and the trial as a whole, this arguable misstatement of fact was not "egregious" enough to "substantially prejudice" Torres's right to a fair trial. Ramseur, 106 N.J. at 322; Timmendequas, 161 N.J. at 575.

We find all Torres's other arguments about the prosecutor's opening and closing statements to be of insufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

V

Both defendants argue their sentences are excessive. We discuss their contentions separately, turning first to (a) Augustin's and Torres's arguments about the judge's application of aggravating and mitigating factors in fixing the prison terms imposed, and then (b) the judge's determination that the prison terms run consecutively to prison terms on unrelated matters that defendants were then serving.

A

Augustin argues that the trial judge erred by not considering mitigating factor nine, because evidence showed he refused to fight Fullman and had

58

obtained his GED while incarcerated, and that the judge should have considered mitigating factors one and two, because his conduct did not cause or threaten serious harm to anyone.

Torres argues that the judge should have considered the fact that he was "only 20 at the time of the offense" as a mitigating factor, asserting that "young adults" like himself "should be treated similarly to juveniles" at sentencing. He further contends that the judge wrongfully considered the fact that he admitted in another matter to being a gang member.

"Appellate review of sentencing decisions is relatively narrow and is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We first consider whether the judge followed the applicable sentencing guidelines set forth in the Code of Criminal Justice. State v. Natale, 184 N.J. 458, 489 (2005); State v. Case, 220 N.J. 49, 63 (2014). Torres was sentenced to a fifty-year prison term, with an eighty-five percent parole disqualifier, for first-degree murder and a concurrent seven-year prison term, with forty-two months of parole ineligibility, for second-degree unlawful possession of a weapon. His conviction for possession of a weapon for an unlawful purpose charge merged with the murder conviction. Augustin was

59

sentenced to a nine-year prison term with a four-and-a-half-year period of parole ineligibility for unlawful possession of a weapon.

N.J.S.A. 2C:11-3(b)(1) provides that a sentence for murder may be a term of thirty years without parole, or a term of years between thirty years and life with thirty years of parole ineligibility. Torres's sentence of fifty years subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, fell within these parameters. N.J.S.A. 2C:43-6 dictates that a sentence for a second-degree offense be between five and ten years. Torres's and Augustin's sentences for second-degree unlawful possession of a weapon were also lawful.

We next consider whether the aggravating and mitigating factors found by the trial judge are based on sufficient credible evidence in the record. State v. Miller, 205 N.J. 109, 127 (2011). If the factors found by the trial judge are so grounded, the sentence must be affirmed even if we would have reached another result. State v. O'Donnell, 117 N.J. 210, 215 (1989). Whether a sentence will "gravitate toward the upper or lower end of the [statutory] range depends on a balancing of the relevant factors." Case, 220 N.J. at 64. A judge "must qualitatively assess" the factors found, assign each an "appropriate weight," and explain how the factors were balanced in arriving at the sentence. Id. at 65-66.

As for Torres, the judge found and applied three aggravating factors: three, the risk that he would commit another crime; six, the extent of his criminal history and the seriousness of his offenses; and nine, the need to deter him and others from violating the law. N.J.S.A. 2C:44-1(a). In finding these factors, the judge took note of Torres's history with the justice system, including two adjudications of delinquency for distribution of a controlled dangerous substance, prior convictions in three separate matters for possession of a controlled dangerous substance, unlawful taking, conspiracy to engage in racketeering, and multiple violations of probation. The judge observed that "for a man of his age," Torres's record was "lengthy." He added that when providing the factual basis for his guilty plea for the racketeering conviction, Torres "admitted that he was a member of the Crips gang" and "was aware" of – and "furthered" – that gang's illegal activities. The judge found that this criminal history, a history with substance abuse, and a failure to respond to previous sentences of probation and incarceration warranted a finding and application of the three aggravating factors. He found no mitigating factors.

Torres argues that the judge should not have considered his admission of being a gang member in that other matter. It appears, however, that the judge viewed this fact only in the context of his assessment of Torres's criminal record

and the likelihood that he would commit more offenses in the future. Torres's gang involvement was a part of his prior criminal history, since it led to his racketeering conviction, and a defendant's membership in an organized criminal enterprise may increase the likelihood of recidivism. It does not appear that, in uttering these facts, the judge intended to improperly punish Torres for racketeering a second time.

Torres also argues the judge should have considered his youth as a mitigating factor. In State v. Zuber, 227 N.J. 422, 451-53 (2017), the Court held that a sentencing judge must take into consideration a set of factors set forth in Miller v. Alabama, 567 U.S. 460, 478 (2012), when sentencing juveniles to life without parole or a lengthy term-of-years sentence with a period of parole disqualification that equates with a life sentence. These factors – the defendant's immaturity, impetuosity, failure to appreciate risks and consequences, family and home environment and family and peer pressures, and the possibility of rehabilitation – are intended to "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Miller, 567 U.S. at 480.

But Torres was not a juvenile when he murdered Fullman. He was twenty years old. In Roper v. Simmons, 543 U.S. 551, 574 (2005), the Court recognized

that while "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns [eighteen]," that age is nevertheless "the point where society draws the line for many purposes between childhood and adulthood" and categorical rules setting eighteen as a dividing line for sentencing purposes are therefore appropriate. We reject Torres's argument that he was entitled to application of the principles announced in <u>Miller</u> and <u>Zuber</u>, we reject his contentions that the judge misapplied the aggravating factors, and we reject his argument that the sentence was excessive.

In sentencing Augustin, the judge also found aggravating factors three, six, and nine, in light of Augustin's significant prior criminal record, issues with controlled dangerous substances and related offenses, and a sporadic employment history. The judge found no applicable mitigating factors. Augustin does not challenge the judge's findings on the aggravating factors; he argues instead that the judge should have found and applied mitigating factors one, two, and nine. He argued before the trial judge, as he does now, that he obtained a GED while incarcerated. He also argued that he refused to fight Fullman, and that this revealed a lack of intent to hurt anyone or to use the gun Brockington claimed – and the jury found – he had in his possession.

We reject Augustin's arguments. Mitigating factors one and two may be found if "the defendant's conduct neither caused nor threatened serious harm," and if he did not contemplate his conduct "would cause or threaten serious harm." N.J.S.A. 2C:44-1(b). While Augustin was only convicted of unlawful possession of a weapon, it does not, a fortiori, follow that these factors must be found; every defendant convicted of a crime that may not have directly led to a violent result, such as unlawful possession of a weapon, cannot expect to receive the benefit of these factors. Further, the fact that Augustin may have backed down from a specific challenge by Fullman to fight does not necessarily mean he did not intend to harm or threaten harm to anyone with the gun he carried at any time in the future.

Mitigating factor nine requires a finding that "character and attitude" suggest the defendant "is unlikely to commit another offense," which would have been at odds with the judge's finding of aggravating factor three: a risk Augustin would commit another crime. The judge's finding in this regard was properly based on Augustin's past criminal history and other relevant factors. We find no error in the judge's decision not to find or apply any mitigating factors, and we cannot conclude that the sentence imposed on Augustin was excessive.

A-5864-17

B

Both defendants argue that the judge erred in imposing prison terms that were ordered to run consecutively to other prison terms both were then serving. When sentenced here, Augustin was serving a five-year prison term, subject to forty-two months of parole ineligibility, for second-degree unlawful possession of a weapon that was imposed by another judge on May 9, 2016. And Torres was serving a four-year prison term for second-degree conspiring to engage in racketeering that was imposed on August 11, 2017. The judge expressly directed at the sentencing hearing – as memorialized in the judgments of conviction – that both defendants' sentences here should run consecutively to the earlier sentences. Both defendants argue that the judge was obligated to not only apply but explain how he applied the factors set forth in State v. Yarbough, 100 N.J. 627, 643-64 (1985) in making that determination.[6]

N.J.S.A. 2C:44-5(a) provides that multiple sentences "shall run concurrently or consecutively as the court determines at the time of sentence,"

---

[6] We note also that Augustin argues – as he argued at the time of sentencing – that at the time he pleaded guilty in the prior matter, the judge at the time was "inclined to postpone sentence until this matter that was open had been resolved, for the purpose of giving a comparent sentence" but nevertheless imposed sentence on the earlier matter because he "was in [the] process of leaving the bench" and "wanted to dispose of" the matter.

A-5864-17

there being "no overall outer limit on the cumulation of consecutive sentences for multiple offenses." "[T]here is no presumption in favor of concurrent sentences and therefore the maximum potential sentence authorized by the jury verdict is the aggregate of sentences for multiple convictions." State v. Abdullah, 184 N.J. 497, 513-14 (2005). Of course, these defendants had already been sentenced on other matters when sentenced here. N.J.S.A. 2C:44-5(b) provides that "[w]hen a defendant who has previously been sentenced to imprisonment is subsequently sentenced to another term for an offense committed prior to the former sentence," as here, the multiple sentences imposed shall so far as possible conform to the requirements of N.J.S.A. 2C:44-5(a). It further states that "[w]hether the court determines that the terms shall run concurrently or consecutively, the defendant shall be credited with time served in imprisonment on the prior sentence in determining the permissible aggregate length of the term or terms remaining to be served." N.J.S.A. 2C:44-5(b)(2).

In short, the judge was obligated to consider the sentences imposed here in light of the sentences defendants were then serving, a consideration that required consideration of the Yarbough factors. See State v. Hudson, 209 N.J. 513 (2012). Yarbough requires that the judge's rationale for imposing a

consecutive term be "separately stated" in the sentencing decision. 100 N.J. at 643. In making the determination, the judge must consider whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims; [and]
>
> (e) the convictions for which the sentences are to be imposed are numerous.
>
> [Id. at 644.]

These criteria are to be applied qualitatively, not quantitatively, and consecutive sentences may be imposed even if most of the criteria support concurrent sentences. State v. Carey, 168 N.J. 413, 427 (2001).[7]

At this stage, it is not possible to deduce the judge's reasoning for imposing consecutive terms when none was given. We, thus, remand for the

---

[7] Yarbough also commands that there should be no double counting of aggravating factors, and "successive terms for the same offense should not ordinarily be equal to the punishment for the first offense." Id. at 644.

judge's further consideration of the imposition of consecutive terms and his findings in support of whatever decision is reached.

* * *

The judgments of conviction in A-5864-17 and A-2506-18 are affirmed, except we remand for reconsideration and further findings on the trial judge's decision to impose, on both defendants, prison terms to run consecutively to prison terms they were then serving.

Affirmed in part, remanded in part.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION